Stevenson *v.* Titus et al., Admrs., Appellants.

Argued October 3, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*A. H. Sayers,* with him *A. A. Purman,* for appellants.

*W. Robert Thompson,* with him *Ambrose Bradley,* for appellee.

OPINION BY MR. JUSTICE STERN, December 5, 1938:

William J. Tanner, Jr., and Bessie Tanner, owners of lands in Greene County, delivered to plaintiff's father, J. J. Stevenson, a written option to purchase the coal underlying 181 acres at $40 per acre; at Stevenson's request plaintiff was named therein as the optionee. Stevenson, purporting to act as agent for plaintiff, showed this option to Eli N. Titus, and told him "I would take $60.00 an acre for the coal and satisfy that mortgage and pay off the mortgage that my boy owed him." ("That mortgage," thus referred to, was in the

amount of $3,000, being a mortgage which "at the time I owed his daughter, Mrs. Augustine"; the other, the "mortgage that my boy owed him," was not a mortgage at all but a judgment note in the sum of $400 held by Titus and recorded as a lien against a property the title to which was in plaintiff, the note being signed by both father and son.) Titus answered: "If you take the cattle [referring to a previous offer made by Stevenson to buy some cattle from Titus] and satisfy the mortgage and judgment, I will give you $55.00 an acre," to which Stevenson replied, "I will accept your proposition of $55.00 an acre." Stevenson delivered to Titus a writing, signed by plaintiff, in the same form as the option which he had obtained from the Tanners, and containing an agreement by plaintiff to sell the coal to Titus at $55.00 an acre. Titus did not sign this paper and subsequently refused to accept a deed for the coal. The present suit was instituted to recover $2,724.56, representing the profit of $15 per acre which plaintiff would have made had the transaction been consummated. The jury awarded this sum with interest, deducting, however, the sum of $400, with interest, owing to Titus on the judgment note of plaintiff and his father.[1]

The fatal defect in plaintiff's verdict is that it was obtained wholly upon the testimony of an incompetent witness. Titus, original defendant, died while the case was awaiting trial, and the administrators of his estate were substituted as defendants; therefore, by the Act of May 23, 1887, P. L. 158, sec. 5, cl. (e), no surviving or remaining party to the contract, nor any other person whose interest was adverse to the right of the deceased party, could testify to the making of the alleged agree-

---

[1] It does not appear why this deduction was the only one allowed by the jury, since the agreement provided also for a deduction due by reason of the cattle transaction, and for the payment of the Augustine mortgage. There was evidence, however, that this mortgage was subsequently foreclosed.

ment. It is entirely clear, from the admissions made by Stevenson, not only that his interest was adverse to that of Titus, but that he was indeed the real party in interest in the transaction and in the suit. It is true he took the option from the Tanners in the name of plaintiff, his twenty-one year old son, but he testified,—whether frankly or naively,—that "the reason I did it was because I was involved, indebted, and I knew if I took the deed in my own name and the title I would have to clear up some things that would take a few days or possibly a week to get it straightened around, which we didn't have very much time." In his conversation with Titus he spoke throughout of himself as being the person in interest. For example, he said to him: "You realize I am making something on it or I couldn't pay off the mortgage and judgment I owe you." Moreover, if the son was the real owner of the Tanner option, and as such entitled to the profit arising from the sale to Titus, the father obviously would not have been able to contract with Titus, as he did, that this profit should be devoted to paying off the amount personally owed by him to Titus by reason of the purchase of the cattle, and, so far as the amount of the profit would permit, to paying off the $3,000 mortgage which the father owed to Titus's daughter. As to this mortgage he testified: "I agreed to do that, that wouldn't have been sufficient to take care of it, *my* profit, but I had arrangements made to take care of it." Even the $400 judgment indebtedness, which also was to be paid out of the profit, resulted originally from a transaction of the father with Titus, the son being made a party only because the title to the property procured in the transaction, and which was to be security for the note, was put in his name. All this testimony came from Stevenson's own lips, and indicates, beyond peradventure, that plaintiff's role was merely that of a straw man, that it was the father who owned the entire beneficial interest in the Tanner option and would ac-

quire for himself the $15 per acre profit. The present suit was for the recovery of that profit, and the verdict rendered by the jury represents and embodies it. It is impossible, therefore, to imagine a situation to which the Act of 1887 would more properly apply.

With the testimony of his father eliminated, plaintiff made out no case whatever. The error of the court in admitting it necessitates a new trial.[2] It is true that two other persons—Mrs. Titus and a Mrs. McClure—are alleged to have been present when the oral agreement was made, but, by the Act of June 11, 1891, P. L. 287, sec. 1, J. J. Stevenson would nevertheless be incompetent as a witness unless and until these other witnesses were called and actually testified adversely to plaintiff: *Roth's Estate,* 150 Pa. 261, 268, 269; *Kauss v. Rohner,* 172 Pa. 481, 488; *Robbins v. Farwell,* 193 Pa. 37, 42, 43; *Schroyer v. Smith,* 204 Pa. 310, 316, 317; *Montelius v. Montelius,* 209 Pa. 541; *Wright v. Hanna,* 210 Pa. 349, 353, 354; *Bowman's Estate,* 301 Pa. 337, 342; *Ray's Estate,* 304 Pa. 421, 434, 435; *Detwiler v. Coldren,* 311 Pa. 44, 48, 49.

One of defendants' major contentions is that the contract sued upon was an oral one and that recovery on it is therefore barred by the statute of frauds. They construe the alleged agreement as constituting a sale of the coal by plaintiff to Titus, plaintiff in turn purchasing it from the Tanners. Plaintiff, on the other hand, interprets the agreement as one for the sale to Titus of plaintiff's option from the Tanners, with an accompanying commitment by Titus to exercise the option and take title directly from the Tanners. The question thus raised

---

[2] If the incompetent testimony had been rejected, binding instructions for defendants would necessarily have followed. Since, however, the testimony was admitted, judgment n. o. v. cannot now be entered; the only remedy is to grant a new trial: *Dalmas v. Kemble,* 215 Pa. 410; *Huffman v. Simmons,* 131 Pa. Superior Ct. 370, 374.

seems to us immaterial[3] for, under our statute of frauds (Act of March 21, 1772, 1 Sm. L. 389, sec. 1), neither in the case of sales nor of options need the writing be signed by the vendee, optionee, or an assignee of the vendee or optionee, since these are not "parties making or creating" the interest in the land which arises from the agreement: *Lowry v. Mehaffy*, 10 Watts 387; *Tripp v. Bishop*, 56 Pa. 424, 428, 429; *Johnston v. Cowan*, 59 Pa. 275, 280; *Smith & Fleek's Appeal*, 69 Pa. 474, 480 (option); *Swisshelm v. Swissvale Laundry Co.*, 95 Pa. 367, 370; *Yerkes v. Richards*, 153 Pa. 646, 650, 651 (option); *Witman v. Reading*, 191 Pa. 134, 140; *Brodhead v. Reinbold*, 200 Pa. 618, 622, 623; *Ottman v. Nixon-Nirdlinger*, 301 Pa. 234, 241. Plaintiff delivered to Titus a written obligation on his part to sell the coal; this writing set forth all the terms according to which the coal was to be conveyed, and it was signed by plaintiff. The signature of Titus was not needed to bring it within the requirements of the statute of frauds, it being sufficient that Titus had orally agreed to take the coal; upon the basis of this writing Titus could have enforced the agreement against plaintiff had the latter refused to perform.

Defendants further seek to excuse the breach of the contract by Titus by asserting that the title was unmarketable. It appears that two prior options on this coal had been given by the Tanners, one to W. W. Hawkins and one to John L. Barclay, although the testimony would indicate that, according to the understanding between these optionees, the Hawkins option was superseded and nullified by the Barclay option. The option given by the Tanners to plaintiff and the agreement be-

---

[3] An option, no less than a binding agreement to purchase, creates a "substantial interest" in the land: *Kerr v. Day*, 14 Pa. 112; *Peoples Street Railway Co. v. Spencer*, 156 Pa. 85, 90, 91; *Strasser v. Steck*, 216 Pa. 577, 580; *Barton v. Thaw*, 246 Pa. 348, 357; *Phoenixville, Valley Forge & Strafford Electric Railway Co.'s Appeal*, 70 Pa. Superior Ct. 391, 396.

tween plaintiff and Titus were made expressly subject to the Barclay option; Barclay himself testified that this option was never exercised; it is, therefore, out of the case. As for the Hawkins option, even if it survived the giving of the option to Barclay, it is not at all clear that it was this option which Titus assigned at the time as his reason for refusing to accept title. Indeed, the Hawkins option was not even referred to in the affidavit of defense, and therefore could not properly be set up as a defense at the trial.

The first and second assignments of error, complaining of the admission of the testimony of J. J. Stevenson, are sustained.

The judgment is reversed and a new trial awarded.