Exton Quarries, Inc. *v.* Zoning Board of
Adjustment (et al., Appellant).

Argued May 3, 1966. Before BELL, C.J., MUSMAN-
NO, JONES, COHEN, EAGEN and ROBERTS, JJ.

reargument refused
April 15, 1967.

*Theodore Rogers,* with him *James E. O'Neill, Jr.,* and *Rogers & O'Neill,* for appellant.

*W. Bradley Ward,* with him *Edward W. Mullinix, William H. Rivoir, Jr., Robert S. Gawthrop, Jr., Robert L. Kendall, Jr.,* and *Gawthrop & Greenwood,* and *Schnader, Harrison, Segal & Lewis,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, March 14, 1967:

This case presents issues of great difficulty and considerable significance regarding the interpretation of the zoning powers granted in The Second Class Township Code,[1] and the constitutionality of certain zoning ordinances enacted pursuant to that Act.

Prior to 1953 appellee, Exton Quarries, Inc., acquired approximately 99 acres of land in West Whiteland Township of Chester County for the purpose of quarrying limestone. Between 1952 and 1955, the owners of Exton obtained chemical analyses of stone and removed about 40 or 50 tons primarily for the purpose of testing quality and suitability for processing. On March 4, 1957 West Whiteland Township enacted a comprehensive zoning ordinance under the authority of The Second Class Township Code. The ordinance placed the Exton tract within its "I-Industrial" zone, the least restricted area in the township. Section 701(3) of the township zoning ordinance, permitted within the "I-Industrial" zone: "3. Any other lawful use of land, except the following, which are specifically prohibited in any District of West Whiteland Town-

---

[1] Act of May 1, 1933, P. L. 103, §2001 added by the Act of July 10, 1947, P. L. 1481, §47, as amended, Act of January 14, 1952, P. L. (1951) 1907, §1; Act of July 13, 1953, P. L. 409, §1, 53 P.S. §§67001-67003. Zoning power granted to first class townships is expressed in almost identical language. Act of June 24, 1931, P. L. 1206, §§3101-3103, Act of May 27, 1949, P. L. 1955, §59, 53 P.S. §§58101-58103.

ship: Arsenal, Asphalt manufacturing or refining, Automobile junk or wrecking yard, Amusement park, Coke ovens, Fat rendering, Fertilizer manufacture, Fireworks or explosive manufacture or storage, Fish smoking or curing, Glue, size or gelatine manufacture, Mining, Petroleum refining, Tank farms for petroleum products storage over 500,000 gallons, Quarrying, Row houses, Tar distillation or manufacture, Tar roofing or waterproofing manufacture, House trailer, or Trailer camps. Any other use of the same general character as those specifically prohibited above or which may be so noxious or offensive by reason of the emission of odor, noise, heat, smoke, dust, fumes, gas, vibration, illumination or water borne waste as to constitute a nuisance."

Between 1962 and 1964 Exton acquired a tract of approximately 8 acres contiguous to the 99 previously purchased.

In 1964 Exton filed an application for a building and use permit authorizing it to quarry, crush rock, and mix concrete and bituminous concrete on the 107 acre tract. The application was denied by the zoning officer and an appeal was taken to the zoning board of adjustment. The board reversed the zoning officer's denial of the permit insofar as the mixing of concrete and bituminous concrete were concerned and since no appeal from this part of the board's action was taken those issues are not now before us. As to the quarrying and rock crushing operations, the board upheld the action of the zoning officer. More specifically, in its conclusions of law with regard to the matters appealed from the Board found:

"1. That it is unnecessary to a decision in this case to determine whether the Zoning Ordinance of West Whiteland Township, and particularly the pro-

hibition of quarrying in section 701 (3) thereof, is constitutional in respect of the Township as a whole.

"2. That the Zoning Ordinance of West Whiteland Township, and particularly the prohibition of quarrying in section 701 (3) thereof, is constitutional in respect of the property of Exton Quarries, Inc.

"3. That section 701 (3) of the Zoning Ordinance of West Whiteland lawfully prohibits the operation of a rock crushing plant on the property of Exton Quarries, Inc.

. . . .

"5. That . . . [Exton] has not established a nonconforming use.

"6. That . . . [Exton] is not entitled to a variance."

From the decision of the zoning board of adjustment, an appeal was taken to the Court of Common Pleas of Chester County. The court of common pleas reversed the board, holding that §701 (3) was invalid as an exercise of the power granted to second class townships and unconstitutional as an exercise of police powers.[2] A petition was filed by the township under Supreme Court Rule 68½ and was granted by us. In its appeal, the township seeks reversal of the court below on grounds that the prohibition of quarrying in the township is not beyond the powers of a second class township, is not unconstitutional, and is not unconstitutional in its application to Exton's land.

---

[2] Although the board distinguished between the prohibition of quarrying and the prohibition of rock crushing, both the court below and the parties here have addressed themselves solely to the prohibition of "quarrying." We therefore assume that the parties and the court below proceeded on the assumption that "quarrying" encompassed rock crushing or that the appeal to us does not involve any separate question of the prohibition of rock crushing.

It should also be noted that appellant-township makes no argument in this Court that the order of the board prohibiting Exton from establishing a quarry on its land is based on the last part of the ordinance dealing with "nuisances."

## I. Statutory Validity of the Prohibition of Quarrying

Exton's claim that The Second Class Township Code does not give West Whiteland the authority to enact an ordinance containing a township wide ban on quarries raises a question of considerable significance in light of the apparently widespread practice by similar political units of adopting zoning measures which totally prohibit within their boundaries some, but not all, residential, commercial and industrial uses.

The ends for which West Whiteland may enact zoning laws are specified in the following statutory language: "§67001. For the purpose of promoting health, safety, morals or the general welfare of townships of the second class, the supervisors are hereby empowered to regulate and restrict the height, number of stories and size of buildings and other structures, their construction, alteration, extension, repair, maintenance and all facilities and services in and about such buildings and structures, and percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes, and may also establish and maintain building lines and set back building lines upon any or all public roads or highways. . . .

"§67002. (a) For any or all said purposes, the supervisors may divide the township into districts of such number, shape and area as may be deemed best suited to carry out the purpose of this article, and within such districts, it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land. All such regulations shall be uniform for each class or kind of buildings

throughout each district, but the regulations in one district may differ from those in another district. . . ."[3]

In deciding whether this language authorizes a second class township to enact a zoning ordinance, it is appropriate to take note of certain principles of construction. While it is true that cases of this Court have often repeated the rule that zoning ordinances must be strictly construed because in derogation of the common law, e.g., *Fidler v. Zoning Bd. of Adjustment,* 408 Pa. 260, 265, 182 A. 2d 692, 695 (1962), the Statutory Construction Act, Act of May 28, 1937, P.L. 1019, §58, 46 P.S. §558 provides, with certain enumerated exceptions not here relevant, that "the rule that laws in derogation of the common law are to be strictly construed, shall have no application to the laws of this Commonwealth hereafter enacted" and that laws "shall be liberally construed to effect their objects and to promote justice." See *Commonwealth v. Ashenfelder,* 413 Pa. 517, 520, 198 A. 2d 514, 515 (1964). The zoning powers of second class townships in question here were granted by the Legislature in 1947, see notes 1 & 3 supra, and hence are to be liberally construed. There is, of course, no conflict between the doctrine of strict construction of zoning ordinances and liberal construction of the zoning enabling acts because the Statutory Construction Act defines a law as "an act of Assembly of this Commonwealth" and hence is not controlling with regard to the construction of ordinances. The statement which this Court made in *Eves v. Zoning Bd. of Adjustment,* 401 Pa. 211, 215, 164 A. 2d 7, 9 (1960) that: "The authority of a municipality to enact zoning legislation must be strictly construed. 'Any fair, reasonable doubt as to the existence of power is resolved by the courts against

---

[3] Act of May 1, 1933, P. L. 103, §§2001, 2002, added by the Act of July 10, 1947, P. L. 1481, §47, 53 P.S. §§67001-67002.

its existence in the corporation, and therefore denied.'
Kline v. Harrisburg, 362 Pa. 438, 443, 68 A. 2d 182
(1949)"[4] is, however, inconsistent with the Statutory
Construction Act and hence, of necessity, not correct.

The essence of Exton's non-constitutional challenge
to §701 (3) is that, under 53 P.S. §67001, once having
designated an industrial district in its zoning laws,
it was compelled thereafter to employ its power "to
regulate and restrict . . . the . . . use of . . . land" in ac-
cordance with the industrial designation. This means,
appellees argue, that since quarrying is an industrial
use of land, the township's power "to regulate and re-
strict" does not encompass the ability to absolutely pro-
hibit any particular industrial uses. In support of this
conclusion the learned court below pointed out that
West Whiteland's power to prohibit particularly of-
fensive uses of land may not be found in its zoning
powers since the Legislature has provided in other
sections of The Second Class Township Code special
police powers to deal with certain specified types of
offensive uses as well as the right to deal with nuisances
generally.[5] The only case cited by Exton as directly
supporting its contention that The Second Class Town-

---

[4]Since the *Kline* case involved an enabling act passed prior
to the enactment of the Statutory Construction Act, what was said
there was not inconsistent with the Statutory Construction Act.

[5] Act of May 1, 1933, P. L. 103, §702, cl. XX, as added by the
Act of July 17, 1935, P. L. 1161, §1, as amended, Act of July 10,
1947, P. L. 1481, §9, 53 P.S. §65720 (prohibition of fireworks and
inflammable articles). Act of May 1, 1933, P. L. 103, §702, cl.
VIII, as amended, Act of May 21, 1943, P. L. 276, §1; Act of July
10, 1947, P. L. 1481, §9; Act of May 24, 1951, P. L. 370, §7; Act
of July 2, 1953, P. L. 354, §6; Act of July 1, 1955, P. L. 249, §1;
Act of May 9, 1961, P. L. 194, §1, 53 P.S. §65708 (prohibition of
dumping refuse). Act of May 1, 1933, P. L. 103, §702, cl. XII; Act
of May 1, 1939, P. L. 41, §1; Act of July 10, 1947, P. L. 1481, §9,
as amended, Act of May 20, 1957, P. L. 174, §5, 53 P.S. §65712
(prohibition of nuisances).

ship Code did not empower West Whiteland to enact §701 (3) is *Norate Corp. v. Zoning Bd. of Adjustment,* 417 Pa. 397, 207 A. 2d 890 (1965).

In dealing with Exton's non-constitutional challenge to the prohibition of quarrying, it is appropriate that we first consider simply the language of the Enabling Act. We believe that the pertinent phrase— "to regulate and restrict . . . the location and use of buildings, structures and land for trade, industry, residence or other purposes"—considered by itself does not compel the conclusion that Exton seeks to establish. Indeed, the most striking aspect of this language —especially in view of the inclusion of the words "other purposes"—is the generality and flexibility of the powers granted. It must be borne in mind that the power granted extends to both *location* and *use.* Exton's argument might have far greater force if the statutory language included only the word "location" and not the word "use." Then we might be persuaded that once a township has been divided into districts for trade, industry and residence, the zoning power could not be further utilized to regulate and restrict the uses within a municipality. But with the employment of the phrase "location and use", we would find it difficult to attach to the statutory term "use" the independent significance which we must assume the Legislature intended. More especially is this so since in light of §2002 (53 P.S. §67002(a)) of the Code which contains a separate grant of power to "divide the township into districts of such number, shape and area as may be deemed best suited to carry out the purpose of this article."

The reasoning of the court below that the Enabling Act should not be construed to empower a second class township to employ its zoning power to prohibit certain offensive uses because powers to prohibit certain specified offensive uses are granted elsewhere in the

Act is ingenious but may be simply answered. Because of the necessity of including provisions for nonconforming uses in zoning legislation, municipalities may not by virtue of the zoning power curtail the offensive uses of land existing at the date of the enactment of the zoning legislation. However, in order to permit municipalities to curtail the increase of such uses which it deemed most offensive, without the expense, time and uncertainty involved in prosecuting a suit in equity or taking measures for the abatement of a nuisance, the Legislature may well have decided to grant second class townships the broader power to prospectively prohibit such uses. Thus the inclusion of specific powers to prohibit a special class of offensive uses does not preclude us from finding, in the zoning power granted, the right to prohibit, subject to the doctrine of nonconforming use, offensive uses.

Exton's reliance on *Norate Corp. v. Zoning Bd. of Adjustment,* supra, is not well placed. In *Norate* this Court held that a zoning ordinance prohibiting off-site billboards throughout a township was not a reasonable exercise of the township's police power. Nowhere in *Norate* is the legislation granting the township power to zone even cited, much less discussed. As we read it, *Norate* nowhere even intimates a view as to the power of a municipality to selectively prohibit uses throughout the township; it merely decides that township-wide prohibition of the billboards in that township failed to bear a reasonable relationship to the public health, safety, morals and general welfare. Indeed, although our research reveals no reported Pennsylvania case which squarely deals with the question whether zoning enabling acts authorize township-wide bans on selected uses, the preponderance of court's expressions on this matter assume such bans to be valid. Compare *Peterson v. Zoning Bd. of Adjustment,* 412 Pa. 582, 195 A. 2d 523 (1963); *Mignatti*

*Appeal,* 403 Pa. 144, 168 A. 2d 567 (1961); *Catholic Cemeteries Ass'n Zoning Case,* 379 Pa. 516, 109 A. 2d 537 (1954); *Mutual Supply Co. Appeal,* 366 Pa. 424, 77 A. 2d 612 (1951); *Appeal of Scranton Lackawanna Indus. Bldg. Co.,* 57 Lackawanna Jurist 173 (C.P. Lackawanna County, Pa. 1956) (per curiam), with *Uwchlan Township v. Carter,* 11 Chester County R. 304 (1963); *Kanig's Appeal,* 56 Pa. D. & C. 53 (C.P. Lackawanna County, Pa. 1946).

In contributing to our consideration that the Enabling Act does authorize township-wide bans on selected uses of land, we have also considered opinions of courts of other jurisdictions construing statutes similar to ours. In *Duffcon Concrete Prods., Inc. v. Borough of Cresskill,* 1 N.J. 509, 64 A. 2d 347 (1949) the highest court of New Jersey held that a municipality was authorized to prohibit all heavy industrial uses by virtue of a statute empowering it "to regulate and restrict . . . the location and use and extent of use of buildings and structures and land for trade, industry, residence, or other purposes." In *Oregon City v. Hartke,* 400 P. 2d 255 (Ore. 1965) the court held that a township might prohibit certain uses under a grant of statutory power " 'to. create or divide the city into districts within some of which it shall be lawful and within others of which it shall be unlawful to . . . carry on certain trades or callings' " and to "regulate, restrict and segregate the location of industries."[6]   On the

---

[6] Cf. *Valley View Village, Inc. v. Proffett,* 221 F. 2d 412, 416 (6th Cir. 1955) where Judge STEWART (later Mr. Justice STEWART of the Supreme Court of the United States) held that an Ohio municipality authorized to " 'regulate and restrict the location of buildings and other structures and of premises to be used for trade, industry, residence or other specified uses . . .' " could exclude all nonresidential and nonagricultural uses. See also *Leary v. Adams,* 226 Ala. 472, 147 So. 391 (1933); *Town of Hartland v. Jensen's, Inc.,* 146 Conn. 697, 155 A. 2d 754 (1959).

other hand, most cases which have struck down as not
authorized, municipality-wide prohibitions of selected
uses have done so on the basis of far more narrowly
drawn enabling statutes.[7]   Thus the prohibition of
slaughter houses in *Mayor & Council of Mount Airy
v. Sappington*, 195 Md. 259, 73 A. 2d 449 (1950) was
based on a zoning statute which only authorized the
municipality to " 'make reasonable regulations in re-
gard to buildings to be erected in said town and grant
building permits for the same; to establish five districts
in said town and regulate the kind of materials used
in the erection of buildings within such districts, with
special reference to the prevention and suppression of
fires.' "[8]   It is true that in *Suburban Ready-Mix Corp.*

---

[7] The court in *Oregon City v. Hartke*, 400 P. 2d 255 (Ore.
1965) while upholding a prohibition of certain uses under a broad
grant of powers, see text supra, observed that: "The statute in
question should be distinguished from those which enable towns
to regulate and restrict one particular item, e.g., billboard adver-
tising or the sale of liquor. Cases construing the latter type of
statute as preventing total exclusion of the item cannot be con-
trolling in the instant case where only one of many uses of land
has been prohibited." Id. at 259 n.4. See *Blancett v. Montgomery*,
398 S.W. 2d 877 (Ky. 1966) (prohibition of exploration for gas
and oil in municipality of 355.18 acres upheld on basis of statute
similar to Act of May 1, 1933, P. L. 103, §2003, added by the Act
of July 10, 1947, P. L. 1481, §47, 53 P.S. §67003).

[8] *Town of Gaithersburg v. Dosh*, 201 Md. 291, 93 A. 2d 747,
749 (1953) (municipality not authorized to prohibit keeping of
livestock in town by virtue of statute empowering it to "regulate
. . . all places where offensive trades may be carried on" or
"places which cause or may cause unsanitary conditions, or condi-
tions detrimental to health") ; *Murphy v. Wright*, 115 S.W. 2d 448
(Tex. Ct. Civ. App. 1938) (city not authorized to prohibit dance
halls by virtue of statute empowering it to "regulate the location
and control the conduct of . . . places of public amusement.") ;
*State v. Kasten*, 382 S.W. 2d 714 (St. Louis Ct. App., Mo. 1964)
(city not empowered to prohibit slaughter houses by virtue of
statute granting it authority to "regulate, suppress and abate
slaughter.") ; *Ruth v. Incorporated Village of Colonie*, 198 Misc.

*v. Village of Wheeling*, 25 Ill. 2d 548, 185 N.E. 2d 665 (1962) and *People ex rel. Trust Co. of Chicago v. Village of Skokie*, 408 Ill. 397, 97 N.E. 2d 310 (1951)[9] the Illinois Supreme Court has expressed the view that the Illinois Legislature did not grant its municipalities the power to ban from their borders any lawful businesses.[10] The Illinois court's expressions however were not part of a considered analysis of the enabling statutes and in neither case was lack of legislative authorization the sole ground upon which the prohibiting ordinances were struck down nor did the court cite the language of any enabling act.

Finally, in considering whether the West Whiteland ordinance banning quarrying throughout the township is authorized by The Second Class Township

---

608, 99 N.Y.S. 2d 471 (S. Ct. 1950) (village not authorized to prohibit billboards by virtue of statute empowering it to "regulate and control the erection, construction and use in, upon and near streets and other public places of billboards and other advertising media."). See also *General Outdoor Advertising Co. v. Department of Public Works*, 289 Mass. 149, 193 N.E. 799, 804 (1935), appeal dismissed on stipulation of counsel, 297 U.S. 725, 56 S. Ct. 495 (1936) ; *Forest Land Co. v. Black*, 216 S.C. 255, 57 S.E. 2d 420 (1950).

[9] Compare *Town of Hobart v. Collier*, 3 Wis. 2d 182, 87 N.W. 2d 868 (1958).

[10] As Judge SCHAEFER pointed out in his concurring opinion in the *Suburban* case, the view taken by the Illinois court puts it in the position of requiring that every municipality in the state must provide for every use somewhere within its borders. In *Mutual Supply Co. Appeal*, 366 Pa. 424, 430, 77 A. 2d 612, 615 (1951) this Court said that prohibition of industrial uses within a township would not "ipso facto" be a legal defect and cited to this effect the leading case of *Duffcon Concrete Prods., Inc. v. Borough of Cresskill*, 1 N.J. 509, 64 A. 2d 347 (1949). Interestingly enough, the Illinois court in *Village of Spillertown v. Prewitt*, 21 Ill. 2d 228, 171 N.E. 2d 582 (1961) held that a densely populated municipality had the power, even in the absence of specific statutory authority, to prohibit strip mining by virtue of a grant to it of general police powers.

Code, we have made reference to the Standard State Zoning Enabling Act (Revised Edition, 1926) prepared by the United States Department of Commerce. The language of §§1 and 2 of that Standard Act are in their pertinent parts virtually identical to that in 53 P.S. §§67001-67002 and thus we assume that our enabling statute passed in 1947 was drafted with the Standard Act firmly in mind. The official version of the Standard Act contains a large number of footnotes explaining the intended meaning of individual terms. We note with interest that after the words "restrict and regulate" footnote 6 to the Act contains the following language: "This phrase is considered sufficiently all-embracing. Nothing will be gained by adding such terms as 'exclude,' 'segregate,' 'limit,' 'determine.'" After the words "other purposes" footnote 14 to the Act contains the following language: "This is a catch-all phrase. It will include every use." The language of footnotes 6 and 14 seems clearly intended to make the powers granted in the Enabling Act broad and flexible.

While the footnotes to the Standard Act are entitled to only limited weight in interpreting our Enabling Act—since the Legislature made no specific allusion to the Standard Act—they do confirm our conclusion that the language employed by the Legislature does encompass the power to selectively prohibit uses on a township-wide basis.

## II. The Constitutionality of West Whiteland's Prohibition of Quarrying[11]

The court below held that the complete prohibition of quarrying in a township as sparsely populated and

---

[11] We reach the constitutional issues in this case solely because no other claims remain upon which it may be decided.

undeveloped as West Whiteland was not an exercise of the zoning power which met constitutional requirements. Appellant not only disputes the correctness of that holding, but also contends that it is the constitutionality of the ordinance as applied to Exton's land which is the "basic" issue in this case. To the extent that appellant is urging by this contention that we must consider the constitutionality of the ordinance as applied to Exton's land before we consider whether West Whiteland Township could prohibit quarrying throughout its borders, we believe the township is incorrect. Recent cases decided by this Court on the constitutionality of zoning ordinances have followed the procedure of considering a challenge to the constitutionality of a zoning ordinance as a whole without first exhausting the question of the constitutionality of the ordinance as applied. *Ammon R. Smith Auto Co. Appeal*, 423 Pa. 493, 223 A. 2d 683 (1966) ; *Eller v. Board of Adjustment*, 414 Pa. 1, 198 A. 2d 863 (1964) ; *Schmalz v. Buckingham Township Zoning Bd. of Adjustment*, 389 Pa. 295, 132 A. 2d 233 (1957). To do as

---

The zoning board's express denial of a variance was not appealed to this Court, undoubtedly because there was little, if anything, in the record to support the grant of a variance. While we believe that the issue of constitutionality as applied to the property owner's land should not normally be reached until all means of obtaining a variance have been exhausted, c.f. *National Land & Inv. Co. v. Easttown Township Bd. of Adjustment*, 419 Pa. 504, 511, 215 A. 2d 597, 602 (1965), that requirement need have no application to the disposition of a constitutional challenge to the ordinance as a whole, since the issue to be decided on such a challenge involves such different factual questions and since a zoning ordinance may be unconstitutional as a whole, although not in its application to a specific property. See *Suburban Ready-Mix Corp. v. Village of Wheeling*, 25 Ill. 2d 548, 185 N.E. 2d 665 (1962).

As to the nonconforming use issue asserted by Exton in its brief here, resolution of that issue would not dispose of the case, since the nonconforming use is claimed as to only part of Exton's land.

58

appellant suggests would result in upholding a restriction on a property owner's right to use his land on the basis of an exercise of power which might be unconstitutional. And the fact that a court can envision an ordinance drafted in a different and constitutional manner which might result in the imposition of the same restriction on a particular parcel of property as that imposed by the actual unconstitutional ordinance in question does not entitle it to assume that a township would have passed that ordinance.

The standards by which Pennsylvania courts judge the constitutionality of zoning ordinances under Article I, §1 of the Constitution of Pennsylvania and the fourteenth amendment to the Constitution of the United States[12] have been stated and restated in a long line of decisions by this Court. A challenge to the constitutionality of a zoning ordinance must overcome the presumption of its validity.[13] The burden of so doing, though heavy, is maintainable and courts may not make it so "onerous as to foreclose, for all practical purposes, a landowner's avenue of redress against the infringement of constitutionally protected rights."[14] Zoning ordinances are valid whenever " 'they are necessary for the preservation of public health, safety, morals or general welfare",[15] but "the power to thus regulate does not extend to an arbitrary, unnecessary or unreasonable intermeddling with the private ownership of property, even though such acts be labeled for the preservation of health, safety and

---

[12] See *Best v. Zoning Bd. of Adjustment*, 393 Pa. 106, 141 A. 2d 606 (1958).

[13] *National Land & Inv. Co. v. Easttown Township Bd. of Adjustment*, 419 Pa. 504, 522, 215 A. 2d 597, 607 (1965).

[14] Ibid.

[15] *Lord Appeal*, 368 Pa. 121, 125-26, 81 A. 2d 533, 535 (1951). (Emphasis omitted.)

general welfare.' "[16]  Moreover, it should be borne in mind that although "zoning is a means by which a governmental body can plan for the future—it may not be used as a means to deny the future"[17] and that courts must determine "the reasonableness of the regulation as it applies to conditions *now existent.*"[18]

The constitutionality of zoning ordinances which totally prohibit legitimate businesses such as quarrying from an entire community should be regarded with particular circumspection; for unlike the constitutionality of most restrictions on property rights imposed by other ordinances, the constitutionality of total prohibitions of legitimate businesses cannot be premised on the fundamental reasonableness of allocating to each type of activity a particular location in the community.  We believe this is true despite the possible existence outside the municipality of sites on which the prohibited activity may be conducted,[19] since it is more probable than not that, as the operator of the prohibited business is forced to move further from the property he owns, his economic disadvantage will increase to the point of deprivation.[20]  Moreover, if one municipality may, with only moderate justification, totally prohibit an undesired use of land, it is not

[16] *Schmalz v. Buckingham Township Zoning Bd. of Adjustment*, 389 Pa. 295, 301, 132 A. 2d 233, 235 (1957).

[17] *National Land & Inv. Co. v. Easttown Township Bd. of Adjustment*, 419 Pa. 504, 528, 215 A. 2d 597, 610 (1965).

[18] *Schmalz v. Buckingham Township Zoning Bd. of Adjustment*, 389 Pa. 295, 302, 132 A. 2d 233, 236 (1957). (Emphasis in original).

[19] Compare *Duffcon Concrete Prods., Inc. v. Borough of Cresskill*, 1 N.J. 509, 64 A. 2d 347 (1949).

[20] The force of this reasoning is, of course, much greater where the prohibited business is one involving extraction of natural resources from the land and hence may be carried on only at a few locations. See, e.g., *Certain-Teed Prods. Corp. v. Paris Township*, 351 Mich. 434, 88 N.W. 2d 705 (1958).

unlikely that surrounding municipalities will do the same—thus increasing the distance to an alternative site and the concomitant economic disadvantage. Thus the possible availability of alternative sites somewhere outside the municipality on which the totally banned business may be conducted does not make permissible the deprivation within the township of property rights imposed by a municipality-wide ban of a particular kind of business. For these reasons, we believe that a zoning ordinance which totally excludes a particular business from an entire municipality must bear a more substantial relationship to the public health, safety, morals and general welfare than an ordinance which merely confines that business to a certain area in the municipality.

The prohibition of quarrying challenged by Exton was enacted by a township which contains a population of approximately 5,000 persons living in an area of approximately 14 square miles or slightly less than 9,000 acres. According to the findings of the board of adjustment the following percentages of the township's area are devoted to the following uses: 10% to residential, 20.9% to institutional, 6.9% to rights-of-way, 56.9% to vacant (which includes agricultural).

Although the board did not specifically so find, the record indicates without contradiction that the five percent of land not covered by the above list is devoted to industrial and commercial uses. Examination of the zoning map attached to the West Whiteland Zoning Ordinance and made part of the record further shows that residences and other structures in West Whiteland are not evenly spread through the township, but clustered in four or five locations. Thus from the map it appears that throughout the township there are at least half a dozen areas encompassing upwards of two hundred acres which are sparsely or

completely devoid of commercial or residential development. In the northwest corner of the township is an area of over three square miles in which less than a hundred residences and commercial buildings are shown on the map. Roughly one half of this area, however, is located within a one mile radius of one of the clusters of residential development noted on the map. The remaining one half of this area is located within more than one but less than two and a quarter miles of the tract.

Appellant urges as a basis for sustaining a prohibition of quarrying in West Whiteland, that quarrying interferes with public health, safety, morals and general welfare because of the dust, noise, vibrations, and excess truck traffic produced. It asserts, in addition, as a basis for the prohibition that a quarry will interfere with the township's water supply and create a large pit in the township which will not only be unaesthetic but also a danger to children in the area. Appellant also relies on the testimony of a planning expert who prepared a comprehensive plan for the township *subsequent* to the enactment of the ordinance prohibiting quarrying.[21]

Several of the bases alleged by the township in support of township wide prohibition of quarrying can, we think, be disposed of easily. The township's reliance on the increase in truck traffic, for instance, is hardly reasonable absent a showing, which does not appear on the record, that quarrying operations will involve any greater increase in truck traffic than other

[21] Several other types of arguments were advanced to justify the prohibition of a quarry from the Exton site, e.g., depreciation of surrounding real estate values. Since our concern is solely with the constitutionality of the municipality wide prohibition, we need not consider evidence on the record or findings of fact which only tend to show the detrimental effect of establishing a quarry at a particular location.

industrial uses which are permitted. The township's assertion that quarrying will disturb the underground water supply in West Whiteland, though found as a fact by the board, is not supported by competent evidence. The only testimony which the township produced to support this statement was given by witnesses unqualified in geology and the thrust of this testimony was contradicted by Exton's witness, head of the geology department of Bryn Mawr College. The contention that creation of the quarrying pit would be a danger to children is not a consideration which merits much weight. The danger to children could be so easily reduced by erection of proper fencing[22]— a regulation which we see no reason why a township could not impose under its zoning powers, not to speak of its other powers—that it hardly supports prohibition of quarrying. The unaesthetic aspects of a quarry pit are insufficient of themselves to support its prohibition.[23]

Among the other justifications for the prohibition of quarrying were creation of dust, noise and vibration. An air pollution expert testifying for the township suggested that an operation of the size proposed to be constructed by Exton would if *uncontrolled* put into the air at least a ton of dust per hour and if *controlled* about a ton of dust per day. Properly controlled dust would tend not to settle, and on a normal day such controlled dust could be seen for about "a mile or

---

[22] In testing the constitutionality of a restriction imposed by zoning ordinances, this Court has approved the correctness of considering whether the detriment sought to be avoided by the ordinance may be dealt with by an alternative method requiring significantly less curtailment of a property owner's right to use his land. *Eller v. Board of Adjustment*, 414 Pa. 1, 198 A. 2d 863 (1964).

[23] *National Land & Inv. Co. v. Easttown Township Bd. of Adjustment*, 419 Pa. 504, 528, 215 A. 2d 597, 610 (1965).

more." No evidence appears of record as to what effect the dust produced might have on health, nor did the air pollution expert indicate the extent to which quarrying and the other uses specifically prohibited in the ordinance would create greater amounts of harmful dust than an increase of permitted industry or those other pollution producing uses permitted in the township, although it is admitted by the expert that such other uses would add pollutants to the air. Given these facts, in addition to the fact that according to the official zoning map of the township attached to the 1957 ordinance, a substantial fraction of the township land is located more than a mile from any cluster of residential development, we fail to see how creation of dust by quarrying bears a sufficiently substantial relationship to the public health, safety, morals and general welfare to justify its prohibition.

As to the noise and vibration from the blasting associated with quarrying, the testimony offered by appellant was from non-expert witnesses who resided anywhere from ½ to 1½ miles from operating quarries. These witnesses stated that blasting and vibration from operations in these quarries shook their houses and was an unpleasant experience. The record does not faintly suggest, however, any reason to suppose that such blasting occurs during sleeping hours; indeed the record suggests that blasting would occur during the day and at most on one or two occasions a week. Nor does this record suggest by any competent evidence that the level of noise or vibration from the blasting as well as other aspects of the quarrying operation would have a defined effect on health. While we can appreciate the great desirability of quiet and tranquility, this does not raise it to a consideration of constitutional significance. Moreover, even assuming the substantial relationship to public health of quiet in an

area closely located to a hospital or to general welfare where noise would interfere with the efficient operation of a school, we fail to see how a township, which according to its zoning map contains one area of over three square miles in which no schools or hospitals are located and in which there are less than 100 residences, and other buildings, could constitutionally prohibit quarrying throughout its borders on the grounds of the noise and vibration.

Nor do we believe that appellant's reliance on the testimony of a planning consultant can support the constitutionality of the zoning ordinance. The planning consultant testified that in a study prepared for the township *subsequent* to the enactment of the prohibition of quarrying, he had advised its exclusion because West Whiteland was primarily a residential community, that people were moving in rapidly "looking for the amenities of country life", that quarrying was a "nuisance", that he had never seen one that was not "somewhat of a problem in terms of either vibration or pollution or noise, . . . [or] danger", that anywhere a quarry was placed in West Whiteland Township industrial zone there would be a problem of excessive truck traffic, that a quarry would be harmful aesthetically, that a quarry would "do a great deal of damage to the township", that he "equated" vibration with the mental health of the community—although he denied being an expert on vibration and never professed to be an expert in mental health and admitted he himself had not suffered an apparent health problem during the time he lived close enough to a quarry to feel vibrations,—and finally that because of the unaesthetic aspects of quarrying it was an activity which would inhibit the development nearby of residences and certain kinds of industry. In light of our previous discussion of traffic, dust and vibration, we believe

that the consultant's testimony consisted in reality of no more than a series of epithets based solidly on only one objection relevant to West Whiteland Township as a whole—that this quarry was unaesthetic and conflicted with his projected plans. Such an objection, as this Court has stated, is not sufficient in and of itself to sustain the constitutionality of a zoning restriction on the use of private property.[24]

Appellant finally urges us to uphold the constitutionality of West Whiteland's prohibition of quarrying because a zoning ordinance containing such prohibition was upheld by the Supreme Court of the United States in *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S. Ct. 114 (1926) which involved a township similar in many respects to West Whiteland. The short answer to appellant's contention is that the question presented to the Court in *Euclid* was the constitutionality of *zoning generally* and the **prohibition of quarrying** was not directly involved. Indeed the Supreme Court of the United States said: "It is true that when, if ever, the provisions set forth in the ordinance in tedious and minute detail, come to be concretely applied . . . to particular conditions . . . some of them, or even many of them, may be found to be clearly arbitrary and unreasonable. But . . . the court will not scrutinize . . . [the ordinance's] provisions, sentence by sentence, to ascertain . . . whether there may be . . . provisions . . . not shown to contribute to the injury complained of, which, if attacked separately, might not withstand the test of constitutionality." 272 U.S. at 395-96, 47 S.Ct. at 121.

Judgment affirmed.

Mr. Justice JONES and Mr. Justice EAGEN concur in the result.

---

[24] Ibid.

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

While I concur with the result reached by the majority in this case, I strongly disagree with some parts of the rationale by which the majority reach their conclusion.

Zoning Acts and Ordinances which provide for the wise and orderly development of a city or township or a community and which are reasonably necessary for the protection of the public health, safety or morals are Constitutional. The natural or zealous desire of many zoning boards or councils to protect, improve and develop their township or community, to plan a city or a township or a community that is both practical and beautiful and to conserve the property values as well as the "tone" of that community is undoubtedly commendable. However, public authorities (including the Legislature) which deal with zoning must constantly remember that "zoning power" is based upon and derived from the police power of the State and may be exercised only in those cases in which the public health, safety, morals and general welfare are in need of protection. To hold otherwise would be to countenance an Unconstitutional invasion and deprivation of the Constitutionally guaranteed property rights of every American.

This case is very important and is exceptionally difficult because the law in the field of zoning—commencing with *Bilbar Construction Company v. Easttown Township Board of Adjustment*, 393 Pa. 62, 141 A. 2d 851—is in such confusion that no one knows with any certainty what it is in many of the zoning situations which arise. There are several reasons for this confusion. First and most important, too many Judges seem to have almost completely forgotten the rights of property granted and ordained to property owners in and by the Constitution of the United States

and in and by the Constitution of Pennsylvania. The second important reason is that the decision reached by a zoning board or by a Court is too often based *solely* upon "general welfare"—an expression which is incapable of accurate definition and in reality is often nothing but the guess or wishes of a few nonelected officials, or sometimes a Judge.

The third important reason is the difficulty in reconciling the conflict between (on the one hand) the Constitutionally ordained and guaranteed right to acquire, possess and protect—which means lawfully use—your own home or your own property as every American in the Land of the Free may wish, and (on the other hand) the right of a Judge or zoning board (members of which are usually appointed and not elected officials) to lawfully impose upon a property owner duties and restraints concerning what he may or may not do with his own property. The decisions or regulations of a zoning board or the provisions of a zoning ordinance are too often based, not upon reasons of health, safety or morals but, upon what such board or council may believe is desirable or aesthetic.*

Everyone used to know, but many have apparently forgotten that the Colonies and the States of the United States were founded because of our ancestors' intense desire for personal liberty, completely free from a shackling or oppressive Government. Our forefathers came to America seeking liberty—liberty of thought, of speech, of religion, and of freedom from interference with their lives or their property. "To secure their

---

* It is very rare that more than six persons out of one hundred could ever agree upon what is "aesthetic." Moreover, neither aesthetics, nor the conservation of property values, nor the stabilization of economic values in a township are singly or combined sufficient to promote the health or the morals or the safety or the general welfare of the township or its inhabitants or property owners. *Medinger Appeal*, 377 Pa. 217, 226, 104 A. 2d 118.

property was one of the great ends for which men entered society. The right to acquire and own property and to deal with it and use it as the owner chooses so long as the use harms nobody, is a natural right. It does not owe its origin to Constitutions. It existed before them. It is a part of the citizen's natural liberty—an expression of his freedom—guaranteed as inviolate by every American Bill of Rights. . . ." *Lord Appeal,* 368 Pa. 121, 130, 81 A. 2d 533. These heartfelt desires and ideals became embodied in the Federal Constitution and in the Constitution of Pennsylvania.

The fundamental and Constitutionally ordained rights of a person with respect to his property are analyzed, reviewed, and stated at length in *Lord Appeal,* 368 Pa., supra, and in *Cleaver v. Board of Adjustment,* 414 Pa. 367, 370-373, 200 A. 2d 408. In *Cleaver* the Court said (pages 370-371): "The law governing the Constitutionality of zoning legislation may be thus summarized:

"The Constitution of the United States in the Fifth Amendment and in the Fourteenth Amendment, and the Constitution of Pennsylvania in Article I, §1, ordain and guarantee the right of private property. Article I, §1, of the Constitution of Pennsylvania provides: 'All men . . . have certain *inherent and indefeasible rights,* among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property. . .' [Emphasis in original Opinion]

"The historical origin and development of our Country, our Birthright and Heritage of Freedom and the (so-called) inalienable fundamental rights, privileges and immunities guaranteed by our Constitution are too often forgotten today.

"The right of private property, together with the right of freedom of speech, freedom of religion, and freedom of the press are the Hallmarks of western

civilization. These Basic Freedoms constitute the fundamental differences which distinguish—and create the great unpassable gulf which divides—western civilization and free peoples, from Communists and from other peoples who are ruled by a despotic dictator.

"It is clear beyond the peradventure of a doubt that the ownership and possession of private property necessarily includes its lawful use—it would be of little or no value unless the owner can deal with and use it as he desires, so long as its use is lawful.

"In Lhormer v. Bowen, 410 Pa. 508, 188 A. 2d 747, the Court aptly said (page 512):

" '. . . As stated in Lened Homes, Inc. v. Dep't of Licenses, . . . [386 Pa.], at page 54: " 'An owner of property is still entitled in Pennsylvania to certain unalienable constitutional rights of liberty and property. These include a right to use his own home [or property] in any way he desires, provided he does not (1) violate any provision of the Federal or State Constitutions; or (2) create a nuisance; or (3) violate any covenant, restriction or easement; or (4) violate any laws or zoning or police regulations *which are constitutional.' "* See also, Andress v. Zoning Board, 410 Pa. 77, 188 A. 2d 709 (1963).' See to the same effect: Lord Appeal, 368 Pa. 121, 81 A. 2d 533, and cases cited therein."

To particularize:

The enabling Act, namely the Second Class Township Code of May 1, 1933, P.L. 103, as amended, 53 P.S. §67001, et seq., gives second class townships many rights and powers. It gives townships the right to ". . . *regulate and restrict** . . . the location and use of . . . land for trade, industry, residence or other purposes," but it does not give such townships the right to *prohibit* any uses of property in that township.

---

* Italics, ours.

The majority have wisely determined that completely prohibitory provisions of the ordinance in this particular case (1) are not authorized by the enabling Act, and (2) would not affect the safety, health or morals of the people in that township and (3) give no right or power to a second class township to entirely prohibit a quarry in that township.

Furthermore, appellee has established a nonconforming use for all of its property except nine acres. This use runs with the land and neither a zoning board, nor any Legislative body, nor any corporation which possesses the power of eminent domain can abrogate or take or destroy or impair appellee's nonconforming property use (unless it is a nuisance) without paying or first securing payment for such property. Cf. *Eitnier v. Kreitz Corp.*, 404 Pa. 406, 412, 172 A. 2d 320; *Penn Township v. Yecko Brothers*, 420 Pa. 386, 390-391, 217 A. 2d 171.

Furthermore, I particularly dissent from the Court's overruling the recent case of *Eves v. Zoning Board of Adjustment*, 401 Pa. 211, 164 A. 2d 7. In the light of the present policy of a majority of this Court to overrule some well established principle of law in nearly every session of the Court, how is it possible for anyone to know and comply with the law?

In a Constitutional republican form of Government such as ours, which is based upon Law and Order, certainty and stability are essential. If the law knows no fixed principles, chaos and confusion will certainly follow, and litigation will multiply. Unless the Courts establish and maintain certainty and stability in the law, businessmen cannot safely and wisely make contracts with their employees or with each other; the meaning of wills, bonds, contracts, deeds and leases will fluctuate and change with each change in the personnel of a Court; property interests will be jeopardized and

frequently lost or changed; Government cannot adequately protect law-abiding persons or communities against criminals; private citizens will not know their rights and obligations; and public officials will not know from week to week or month to month the powers and limitations of Government. This has been recognized for centuries by English-speaking peoples. Lord Coke, Chief Justice of England, thus wisely expressed (circa 1600) these truths: "The knowne certaintie of the law is the safetie of all." This has been a beacon light for Anglo-American Courts, for text authorities, and for law-abiding Americans ever since the foundation of our Country. In the realm of the law it is usually expressed in the principle known as Stare Decisis. It is too often forgotten that Stare Decisis is one of the bed-rocks upon which the House of Law has been erected and maintained.

For the above reasons, I concur with the result reached by the majority.

———

DISSENTING OPINION BY MR. JUSTICE COHEN:

The majority have again demonstrated their inclination in the area of zoning law to pay lip-service to the prevailing and applicable law and then to decide that somehow the case under consideration falls outside of that law. A case in point is *Eller v. Board of Adjustment,* 414 Pa. 1, 198 A. 2d 863 (1964), wherein the majority stated: "The principles which govern a constitutional attack upon a zoning ordinance once again have been recited in the recent case of Anstine v. Zoning Board of Adjustment, 411 Pa. 33, 36-37, 190 A. 2d 712, 714-15 (1963), from which we quote: 'The burden of proving clearly and unmistakably the unconstitutionality of a legislative enactment is upon the person so asserting. [Citing cases.] Accompanying this

burden is the rule that ". . . where the constitutionality of zoning ordinances has been attacked, we have presumed that the municipal [or township] legislative body acted with purpose to serve the public welfare and that all intendments are in favor of their action." [Citing cases.] The burden of proof in an attack on the constitutionality of a zoning ordinance, although heavy, can be maintained. In Archbishop O'Hara's Appeal [389 Pa. 35, 131 A. 2d 587 (1957)], quoting from Lord Appeal, 368 Pa. 121, 81 A. 2d 533 and White's Appeal, 287 Pa. 259, 134 A. 409, it was stated [389 Pa. at 57-58] : " ' ". . . all property is held in subordination to the right of its reasonable regulation by the government *clearly necessary* to preserve the health, safety or morals (or general welfare) of the people. . . . There is one matter that is quite certain, *the power to thus regulate does not extend to an arbitrary, unnecessary or unreasonable intermeddling with the private ownership of property, even though such acts be labeled for the preservation of health, safety and general welfare . . .*" ' " In Schmalz v. Buckingham Twp. Zoning Board of Adjustment, 389 Pa. 295, 132 A. 2d 233, the Court held that it was the duty of a court, before which the reasonableness of a zoning ordinance has been questioned, to determine whether that ordinance constituted a valid exercise of the police power. While the courts are bound to accept the judgment of the legislative body concerning the necessity for zoning classifications, however, the courts may inquire as to whether or not a particular zoning classification bears a substantial relationship to the public health, safety, morals or general welfare. [Citing cases.]' (Italics in the original.)" 414 Pa. at 5-7, 198 A. 2d 865-866.

In my opinion the regulation herein involved did not amount to an "arbitrary, unnecessary or unreasonable intermeddling with the private ownership of property. . . ." And the cavalier fashion by which the ma-

jority opinion disposes of every legislative objective in enacting the zoning ordinance in question fails to convince me that I am wrong. The legislative objectives of the zoning ordinance prohibiting quarrying were to: (1) Control traffic on an already congested highway; (2) Prevent the expulsion of dust in great quantities into the atmosphere; (3) Protect the surrounding property owners or users (including elementary school children) from the dangers of blasting; (4) Protect the water supply of the surrounding property owners and users; (5) Protect the township roads from deterioration from over use by heavily laden trucks and from sink holes resulting; (6) Eliminate the noise emanating from blasting and rock crushing; and (7) Prevent the creation of a large hole in the middle of the township.

To my way of thinking, these considerations amount to very legitimate public purposes and are certainly so reasonably related to health, safety, morals and general welfare that a casual brushing aside and disregard of the merit of each of them will not appease me. The majority are content to supply their own solution to each of the problems presented by diminishing the record (by finding incompetent the township's testimony with regard to the underground water supply), by suggesting legislation which the township chose not to enact (in particular, the fencing of the quarry to protect children), or by superficial treatment (such as concluding that because the record does not indicate that blasting will occur during sleeping hours it will not disturb the community).

Perhaps the most glaring abuse evident in the majority opinion is its discussion of the problem of the diminished water supply. Even assuming that with regard to all of the other issues the majority are correct, their treatment of this question alone necessitates that this Court remand the matter to the

board. While affirming the judgment of the court below, the majority opinion in effect, reverses the decision of the board and grants relief equivalent to judgment non obstante veredicto. In granting such relief upon a diminished record, the majority have ignored a rule of long standing that a judgment may not be entered by a court which has eliminated evidence appearing in the record; in such a case, the proper remedy is the grant of a new trial. *Brandon v. Peoples Natural Gas Company*, 417 Pa. 128, 207 A. 2d 843 (1965); *Cherry v. Mitosky*, 353 Pa. 401, 45 A. 2d 23 (1946). The applicable law is well stated by this Court in *Kotlikoff v. Master*, 345 Pa. 258, 265, 27 A. 2d 35, 38-39 (1942) as follows: ". . . . In Stevenson v. Titus, 332 Pa. 100, it was held, as follows (pp. 102, 104): 'The fatal defect in plaintiff's verdict is that it was obtained wholly upon the testimony of an incompetent witness . . . With the testimony of his father eliminated, plaintiff made out no case whatever. . . . If the incompetent testimony had been rejected, binding instructions for defendants would necessarily have followed. Since, however, the testimony was admitted, judgment n.o.v. cannot now be entered; the only remedy is to grant a new trial.' The rule applicable in such cases is well stated in Huffman v. Simmons, 131 Pa. Superior Ct. 370, at page 374. '. . . in entering judgment non obstante veredicto under the Act of April 22, 1905, P.L. 286, the judgment must be entered upon the evidence in the record in the court below as it existed at the close of the trial: Dalmas v. Kemble, 215 Pa. 410. If upon consideration of the whole evidence "it shall appear that a binding direction for either party would have been proper *at the close of the trial,* the court may enter judgment later with the same effect": Ibid, p. 413. But "the court can neither eliminate evidence which may have been improperly admitted, nor insert offers of evidence which

should have been admitted but were excluded; the remedy in either case is a new trial": Mincy v. Washington Nat'l Ins. Co., 130 Pa. Superior Ct. 285.' See also Dixon v. Metro. Life Ins. Co., 136 Pa. Superior Ct. 573, 578; Heffron v. Prudential Ins. Co., 137 Pa. Superior Ct. 69, 72."

In view of the foregoing, the majority improperly reversed the board on a record diminished by the exclusion by this Court of evidence deemed by it to be incompetent.

The danger of the majority's rationalizations is that while it superficially recognizes that there are standards by which to test the constitutionality of zoning legislation, it meticulously avoids their application by substituting its judgment for that of the zoning board. In effect, this decision has made our Court a zoning board—and a poor one at that.

Furthermore, this Court has held on several occasions that on an appeal from an order of a trial court reversing the decision of a zoning board of adjustment, without taking additional testimony, the scope of review is limited to determining whether the board abused its discretion or committed an error of law. *Polizzi v. Zoning Board of Adjustment*, 420 Pa. 405, 218 A. 2d 226 (1966); *National Land and Investment Company v. Eastern Township Board of Adjustment*, 419 Pa. 504, 215 A. 2d 597 (1965). In a situation like the instant case, where the constitutionality of the statute as a whole is not attacked but only its constitutionality as applied to a particular property, the findings of fact of the board assume even more importance than in a *broad* constitutional attack. The majority have completely ignored this standard by substituting their own findings of fact for those of the board.

The majority compound their error by stating in the second footnote that because no issue was raised. by

either party with regard to the board's conclusion that the zoning ordinance prohibits rock crushing on the Exton property, the parties and the lower court assumed that quarrying encompassed rock crushing. That is illogical. A conclusion of law was reached by the board which was against the interests of Exton. Since Exton chose not to question that determination, it must be concluded that Exton abandoned its contention that the prohibition of rock crushing was unconstitutional. That is the only assumption that may be drawn from the failure of either party or the lower court to discuss rock crushing as a separate prohibited activity. Rock crushing and quarrying are two different activities each of which is prohibited by the ordinance. The reversal of the board's decision by the lower court on the matter of quarrying does not change the board's conclusion with regard to rock crushing since the latter determination has not been attacked by an appeal by the party injured.

Finally, as an example of the majority opinion's disregard for the appropriate burden of proof in an attack on the constitutionality of a zoning ordinance, I cite its discussion of the problem of dust expulsion. One of the legislative objectives behind the ordinance was to prevent the expulsion of great quantities of dust into the air. Since this problem was one of the factors that led to the enactment of the ordinance which is cloaked with a presumption of constitutionality, the burden is upon Exton to prove that the amount of dust expelled into the air by its quarrying activities would not be excessive. The majority, however, reverse the burden and conclude that because the township presented no evidence as to the effect of the dust on health or as to the relative increase in air pollution caused by permissible uses of the land, there is no justification for the ordinance on that ground.

I dissent.