## Concord Township Appeal.

Argued May 6, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*John W. Wellman,* with him *Chadwick, Petrikin Ginsburg & Wellman,* for appellant.

*Harry F. Dunn, Jr.,* with him *Class, Saulnier, Dunn and Abel,* for appellee.

*John P. Trevaskis, Jr., J. Scott Calkins, Jan Krasnowiecki,* and *Trevaskis & Doyle,* and *Shaffer, Calkins & Balaban,* for amicus curiae.

*Robert J. Woodside, Robert E. Woodside,* and *Woodside & Woodside,* filed a brief under Rule 65.

OPINION BY MR. JUSTICE ROBERTS, February 24, 1970:

Appellee Kit-Mar Builders, Inc., entered into an agreement to purchase a 140-acre tract of land in Con-

cord Township, Delaware County. The agreement was contingent on the tract being rezoned to permit the construction of single-family homes on lots of one acre, since the tract was then zoned to require lots of no less than two acres along the existing roads and no less than three acres in the interior. Appellee's request for rezoning and application for a building permit were denied; it then appealed to the zoning board of adjustment and announced that it would not seek to prove the hardship necessary to secure a variance but would instead attack the constitutionality of the zoning ordinance as applied to the property in question. The zoning board upheld the minimum lot requirements and appellee took its case to the court of common pleas. That court took no additional testimony but made new findings of fact and reversed the board. Concord Township then filed a petition for allowance of an appeal to this Court which we granted.

Initially we must note that the trial court erred in making new findings of fact without taking additional testimony. Without an independent taking of evidence the trial court could not properly make its own findings of fact, but could only review the decision of the board to determine if an abuse of discretion or an error of law had been committed. See, e.g., *National Land and Investment Company v. Easttown Township Board of Adjustment,* 419 Pa. 504, 215 A. 2d 597 (1965) ; *Cleaver v. Board of Adjustment,* 414 Pa. 367, 200 A. 2d 408 (1964) ; *Tidewater Oil Company v. Poore,* 395 Pa. 89, 149 A. 2d 636 (1959). However, it remains within the province of this Court to affirm the action of the trial court, even if that action was based on an erroneous procedure, if there are independent grounds for affirmance. See *Sherwood v. Elgart,* 383 Pa. 110, 117 A. 2d 899 (1955). We conclude that, even accepting the findings of the zoning board, the ordinance here in question is unconstitutional under the test set forth

in our decision in *National Land Investment Company v. Easttown Township Board of Adjustment,* 419 Pa. 504, 215 A. 2d 597 (1965).

We decided in *National Land* that a scheme of zoning that has an exclusionary purpose or result is not acceptable in Pennsylvania. We do not intend to say, of course, that minimum lot size requirements are inherently unreasonable. Planning considerations and other interests can justify reasonably varying minimum lot sizes in given areas of a community.[1] "At some point along the spectrum, however, the size of lots ceases to be a concern requiring public regulation and becomes simply a matter of private preference." 419 Pa. at 524, 215 A. 2d at 608.[2] The two and three acre minimums imposed in this case are no more reasonable than the four acre requirements struck down in *Nation-*

---

[1] The fundamental proposition in cases involving property rights is that an individual generally should be able to utilize his own land as he sees fit. U.S. Const. Amends. V, XIV. Although zoning is, in general, a proper exercise of police power which can permissibly limit an individual's property rights, *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S. Ct. 114 (1926), it goes without saying that this restriction on the individual's right to use his own property cannot be unreasonable. E.g., *Eller v. Board of Adjustment,* 414 Pa. 1, 198 A. 2d 863 (1964).

[2] Cf. Sager, Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent, 21 Stan. L. Rev. 767, 791 (1969): "The policy issue thus becomes one of the quantum of acknowledged social injustice involved in a formal governmental unit excluding or segregating people on the basis of their means. If the question is one of the constitutionality of individuals acting in a fashion that excludes the poor from neighborhoods—through covenants of home value or size of land and structure or whatever—the balance struck may be different because of the values assigned to the individual's freedom to dispose of property. It would seem that the serious harm done to accepted egalitarian ends would at least preclude direct governmental promulgation of exclusionary land devices, unless those devices find their justification in the effectuation of governmental ends of overriding importance." Compare *Shelley v. Kraemer,* 334 U.S. 1, 68 S. Ct. 836 (1948).

*al Land.* As we pointed out in *National Land,* there are obvious advantages to the residents of a community in having houses built on four—or three—acre lots. However, minimum lot sizes of the magnitude required by this ordinance are a great deal larger than what should be considered as a *necessary* size for the building of a house,[3] and are therefore not the proper subjects of public regulation. As a matter of fact, a house can fit quite comfortably on a one-acre lot without being the least bit cramped.[4] Absent some extraordinary justification, a zoning ordinance with minimum lot sizes such as those in this case is completely unreasonable.

As the primary justification for the zoning ordinance now before us the township contends that lots

---

[3] A three-acre lot, for instance, is an enormous tract on which to build a single house. This is best illustrated by pointing to some familiar landmarks and areas that encompass approximately three acres. For example, in the City of Pittsburgh, the area bounded by Smithfield Street and William Penn Place and Cherry Way, stretching from Forbes Avenue through Fifth Avenue and Oliver Avenue to approximately the half-way point in Mellon Square is about three acres in size. In Harrisburg, the Highway and Safety Building and its adjoining plaza is built on a lot of approximately three acres. In Philadelphia, the Lit Brothers Store lot, which takes up an entire square block bounded by 8th Street, Market Street, 7th Street, and Filbert Street, is only slightly more than three acres in size; the Wanamaker's store occupies somewhat less than three acres; and Rittenhouse Square, divided down the middle, would create two lots of about three acres each.

These figures are supported by letters from: Harrisburg—Ronald S. Pontius, Space and Facilities Planning Unit, Pennsylvania Department of Property and Supplies; Pittsburgh—Samuel Marsh, Pittsburgh Department of Public Works; Philadelphia—Paul F. Croley, Executive Vice President, Philadelphia Industrial Development Corporation. These letters are on file with the Prothonotary's office.

[4] The Kaufmann's Department Store in Pittsburgh is built on approximately a one-acre lot, and clearly a house built on the same area would hardly want for elbow room. See note 2, supra.

of a smaller size will create a potential sewerage prob-lem.[5] It was on this question that the zoning board and the trial court made conflicting findings of fact. Wheth-er a potential sewerage problem exists or not is irrele-vant, however, since we *explicitly rejected* the argu-ment that sewerage problems could excuse exclusionary zoning in *National Land*: "We can not help but note also that the Second Class Township Code provides for establishing sanitary regulations which can be enforced by a 'sanitary board' regardless of the zoning for the area. The Code also provides for the installation and maintenance of sewer systems but the township has made no plans in this regard. In addition, under the township subdivision regulations, the zoning officer may require lots larger than the minimum permitted by the zoning ordinance if the result of percolation tests upon the land show that a larger land area is needed for proper drainage and disposal of sewage. These legislatively sanctioned methods for dealing with

[5] Appellant also offers some other arguments which are so clearly makeweights as to barely require comment. For example, appellant notes that there is but one bus in the township. The rationale of *National Land* hardly allows a municipality to con-tinue indefinitely an exclusionary zoning scheme because it refuses to purchase and operate a second bus. Likewise, it is claimed that the current road network is suitable only for the present popula-tion, which hardly explains why new roads should not be built to accommodate new people. As we said in dealing with the same argument in *National Land*, zoning may not be used "to avoid the increased responsibilities and economic burdens which time and natural growth invariably bring." 419 Pa. at 528, 215 A. 2d at 610. See *Delaware County Community College Appeal*, 435 Pa. 264, 254 A. 2d 641 (1969) ; *Lower Merion Twp. v. Enokay, Inc.*, 427 Pa. 128, 233 A. 2d 883 (1967) ; *Archbishop O'Hara's Appeal*, 389 Pa. 35, 131 A. 2d 587 (1957). Finally, almost unbelievably, appellant maintains that two and three acre zoning would be more in con-formity with the rural and historical surroundings of the neighbor-hood. These are exactly the kinds of aesthetic considerations which we explicitly rejected in *National Land*. .   .

the sewage problem compel the conclusion that a four acre minimum is neither a necessary nor reasonable method by which Easttown can protect itself from the menace of pollution." 419 Pa. at 526, 215 A. 2d at 609.

Everything said in the quoted paragraph is equally applicable to the case now before us. We in effect held in *National Land* that because there were alternative methods for dealing with nearly all the problems that attend a growth in population, including sewage problems, zoning which had an exclusive purpose or effect could not be allowed. See *Westwood Forest Estates, Inc. v. Village of South Nyack*, 23 N.Y. 2d 424, 428-29, 244 N.E. 2d 700, 702-03 (1969): "This is not to say that the village may not, pursuant to its other and general police powers [i.e., not zoning power], impose other restrictions or conditions on the granting of a building permit to plaintiff, such as a general assessment for reconstruction of the sewage system, granting of building permits . . . in stages, or perhaps even a moratorium on the issuance of any building permits, reasonably limited as to time. But, whatever the right of a municipality to impose ' "a * * * temporary restraint of beneficial enjoyment * * * where the interference is necessary to promote the ultimate good of either the municipality as a whole or of the immediate neighborhood" ', such restraint must be kept ' "within the limits of necessity" ', and may not prevent permanently the reasonable use of private property for the only purposes to which it is practically adapted [citations omitted]."

We recently reaffirmed exactly this position in *Delaware County Community College Appeal*, 435 Pa. 264, 270, 254 A. 2d 641, 645 (1969), where this Court, citing *National Land*, explicitly rejected a zoning exclusion as a proper method for dealing with sewerage problems: "The court below pointed out that once the

special exception is granted, the college will still be required to make 'appropriate arrangements [for sewerage] . . . consistent with local ordinances and regulations and state statutes pertaining to sewerage disposal. . . . *If expansion is required, then it should be accomplished.'* We are in accordance with this view; *the Board could not properly make a broad scale zoning decision simply because of a potential sewerage problem in the future.*" (Emphasis added.) We once again reaffirm our past authority and refuse to allow the township to do precisely what we have never permitted —keep out people, rather than make community improvements.

The implication of our decision in *National Land* is that communities must deal with the problems of population growth. They may not refuse to confront the future by adopting zoning regulations that effectively restrict population to near present levels.[6] It is not for any given township to say who may or may not live within its confines, while disregarding the interests of the entire area. If Concord Township is successful in unnaturally limiting its population growth through the use of exclusive zoning regulations, the people who

___

[6] "The question posed is whether the township can stand in the way of the natural forces which send our growing population into hitherto undeveloped areas in search of a comfortable place to live. We have concluded not. A zoning ordinance whose primary purpose is to prevent the entrance of newcomers in order to avoid future burdens, economic and otherwise, upon the administration of public services and facilities can not be held valid." 419 Pa. at 532, 215 A. 2d at 612.

Although *National Land*, and this problem in general, is postured as involving the constitutional due process rights of the landowner whose property has been zoned adversely to his best interests, it cannot realistically be detached from the rights of other people desirous of moving into the area "in search of a comfortable place to live." See generally Sager, Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent, 21 Stan. L. Rev. 767 (1969).

would normally live there will inevitably have to live in another community, and the requirement that they do so is not a decision that Concord Township should alone be able to make.

While our decision in *National Land* requires municipalities to meet the challenge of population growth without closing their doors to it, we have indicated our willingness to give communities the ability to respond with great flexibility to the problems caused by suburban expansion. Most notable in this regard is our decision in *Village 2 at New Hope, Inc. Appeals,* 429 Pa. 626, 241 A. 2d 81 (1968), in which we approved planned unit development. "It would seem that this decision is a forerunner of a necessary change in the law of planned development. Caught between increasing population pressure and urban sprawl and the reluctance of the rural communities to absorb their fair share of the load, planners have been faced with an unpleasant choice. They are now equipped with a proper instrument to meet the challenge. The scope of this decision is by no means limited to residential and ancillary usage. It can just as effectively be applied to commercial and industrial development as well as to new combinations of land use which are only limited by the ingenuity of the planner and developer. Effective interrelations between the various component needs of the community can now be more easily realized. For instance, various types of housing, schools, and recreational facilities can be planned not only for the immediate needs of the community, but also to effectuate broad social purposes. The adverse economic impact of large-scale development can be mitigated if not entirely eliminated by the judicious juxtapositioning of revenue-producing development with residential and public uses. In this manner, achievement of good traffic separation, public transportation, visual enjoyment, and a host of other desiderata can be realized as [sic]

much reduced economic cost." Zucker and Wolffe, Supreme Court Legalizes PUD: New Hope from New Hope, 2 Land Use Controls 32, 33-34 (1968).

We will not turn our back on the approach to these problems which we adopted in *National Land* and *Village 2 at New Hope*. New and exciting techniques are available to the local governing bodies of this Commonwealth for dealing with the problems of population growth. Neither Concord Township nor Easttown Township nor any other local governing unit may retreat behind a cover of exclusive zoning. We fully realize that the overall solution to these problems lies with greater regional planning, but until the time comes that we have such a system we must confront the situation as it is. The power currently resides in the hands of each local governing unit, and we will not tolerate their abusing that power in attempting to zone out growth at the expense of neighboring communities.

Finally, we cannot ignore the fact that in the narrow confines of the case before us, Concord Township's argument that three-acre minimum zoning is necessary for adequate on-site sewerage is patently ridiculous. The township does not argue that on-site sewerage is impossible for the lots in question; instead it maintains that if houses are built on lots of one acre, as envisioned by appellee, not on lots of three acres, on-site sewerage will become unfeasible. This argument assumes that all of the lot where the house is not is necessary for waste effluence, which simply is not what happens. The difference in size between a three-acre lot and a one-acre lot is irrelevant to the problem of sewage disposal, absent the construction of a house of an unimaginably enormous magnitude.

This proposition is fully borne out by the Pennsylvania Department of Health Regulations for the Administration of the Pennsylvania Sewage Facilities Act,

Act of January 24, 1966, P. L. (1965) 1535, 35 P.S. §750.1 et seq., Regulation Chapter 4, Article 423, Standards for Individual Sewage Disposal Systems §7.1-1. This regulation tells us that if the soil percolation rate on a given lot exceeds 60 minutes per inch no on-site sewage disposal will be permitted. Let us assume that the lots in question have the bare minimum percolation rates necessary to support on-site sewerage. Section 7.3 indicates that on a lot with the minimum acceptable percolation rate the required absorption area is only 330 square feet per bedroom. See §7.3, Table IV.[7] Adding in the maximum isolation distances provided for in §2, Tables I and II,[8] the required ab-

---

[7] "7.3 Absorption Area Requirements for Private Residential (Provides for Garbage Grinder and Automatic-Sequence Washing Machines)

TABLE IV

| Percolation Rate (time for water to fall 1 in. in min.) | Septic Tank Effluent Required Absorption Area Sq. ft./bedroom | Aerobic Tank Effluent Required Absorption Area (Standard trenches, seepage beds, seepage pits) |
|---|---|---|
| 15 or less | 175 | *120 |
| 16 - 30 | 250 | *210 |
| 31 - 45 | 300 | 300 |
| 46 - 60 | 330 | 330 |

* Indicates reduced absorption area other than required for conventional septic tank effluent. Aerobic sewage treatment systems utilizing reduced absorption areas for effluent disposal are experimental and shall be so indicated on the permit."

[8] "2. Isolation Distances

The minimum isolation distances shown in Tables I and II shall be maintained between the sewage disposal system and the respective features itemized in the tables. Where conditions warrant, greater isolation distances may be required.

TABLE I

Septic Tank-Minimum Isolation Distances

Property Line .. ...................... 10 feet

sorption area for a three bedroom house on a lot with the minimum acceptable percolation rate would be only a little more than 1,000 square feet. We can conclude from these Department of Health regulations that a three bedroom house cannot be built with on-site sewerage if such disposal system would require more than approximately a 1,000 square foot absorption area. One acre contains 43,560 square feet and three acres contain 130,680 square feet. It is obviously sheer fantasy for the township to claim that, because of an on-site sewerage problem, houses cannot be built on a one-acre lot, but can be built on a three-acre lot.

Thinly veiled justifications for exclusionary zoning will not be countenanced by this Court. We rejected them in *National Land* and in our very recent decision in *Delaware County Community College Appeal*, supra, and we reject them here.

Decree affirmed.

---

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

The basic question is whether an Ordinance which imposes a minimum lot requirement of not less than two acres along the existing roads, and no less than three acres in the interior of the township, is Constitutional.

The Constitution of Pennsylvania, in Article I, Section 1, and the Constitution of the United States, in

Occupied Buildings ..................... 10 feet
Individual Water Supply ............... 50 feet

TABLE II

*Leaching System-Minimum Isolation Distances*

Individual Water Supply ............... 100 feet
Streams, Lakes or Other Surface Water    50 feet
Occupied Buildings ..................... 10 feet

Property Lines ........................ 10 feet"

the Fifth Amendment and in the Fourteenth Amendment, ordain and guarantee the right of private property. They further protect its "taking," except by due process of law, or, if taken for public use, without payment of just compensation.

Article I, Section 1, of the Constitution of Pennsylvania assures these basic fundamental property rights by providing: "All men . . . have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of *acquiring, possessing and protecting property . . . .*"\* See, *Parker v. Hough,* 420 Pa. 7, 10-11, 215 A. 2d 667; *Cleaver v. Board of Adjustment,* 414 Pa. 367, 371-372, 200 A. 2d 408; *Andress v. Zoning Board of Adjustment,* 410 Pa. 77, 87, 188 A. 2d 709; *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S. Ct. 114 (1926).

In *Parker v. Hough,* 420 Pa., supra, the Court accurately and succinctly said (pages 10-11):

"An owner of property in this Commonwealth has a tremendously prized and fundamental Constitutional right to use his property as he pleases, subject to certain exceptions hereinafter set forth. Cleaver v. Board of Adjustment, 414 Pa. 367, 371-372, 200 A. 2d 408; Andress v. Zoning Board of Adjustment, 410 Pa. 77, 87, 188 A. 2d 709; Key Realty Co. Zoning Case, 408 Pa. 98, 104, 182 A. 2d 187; Siciliano v. Misler, 399 Pa. 406, 409, 160 A. 2d 422; Sandyford Park Civic Assn. v. Lunnemann, 396 Pa. 537, 539, 152 A. 2d 898; Lened Homes, Inc. v. Department of Licenses, 386 Pa. 50, 54, 123 A. 2d 406; Lord Appeal, 368 Pa. 121, 125, 81 A. 2d 533.

"As the Court aptly said in Cleaver v. Board of Adjustment, 414 Pa., supra (pages 371-372) : ' ". . . ' "An owner of property is still entitled in Pennsylvania to certain unalienable constitutional rights of liberty and

---

\* Italics, ours.

480

property. These include a right to use his own home [or property] in any way he desires *provided he does not*\* (1) violate any provision of the Federal or State Constitutions; or (2) create a nuisance; or (3) *violate any covenant, restriction* or easement; or (4) violate any laws or zoning or police regulations *which are constitutional.*" '\*\* . . .'' ' "

Many zoning cases, including the present one, fall into a twilight zone. For over a century it was the law of this Commonwealth that every person in the United States of America had a Constitutionally ordained right to own, possess, protect and use his property in any way he desired, so long as it did not injure or adversely affect the health or morals or safety of others. This was one of the two basic differences between America and Communism. Then along came "zoning" with its desirable and worthwhile objectives. The result was that all the aforesaid basic fundamental rights of an owner of property were restricted by a Judicially created higher right, namely, the general welfare of the people of that community. No one knows, and the Courts have been unable to define what is meant by "general welfare." To some, it means the absolute, unqualified, Constitutional right to liberty and property, subject to the above-mentioned restrictions. To some, it means what the Zoning Board or a Court believes is best for the community or township or county involved. To others, it means the right of our expanding population to live in any county or place in our Country they may desire. To still others, it means the right to have the Government purchase and set aside millions of acres of open land for the benefit of our Country. These rights are sometimes indefinite, sometimes overlapping, and sometimes conflicting.

---

\* Italics in *Cleaver v. Board of Adjustment* Opinion.
\*\* Italics. ours.

This is one of those debatable cases which leave me in "no man's land."

Although zoning almost always has a worthwhile objective, since it is a restriction on and a deprivation of a property owner's Constitutionally ordained rights of property, it can be sustained only if it is clearly necessary to protect the health or safety or morals or general welfare of the people. *Cleaver v. Board of Adjustment,* 414 Pa., supra; *Parker v. Hough,* 420 Pa., supra; *Eller v. Board of Adjustment,* 414 Pa. 1, 198 A. 2d 863. I believe that this zoning ordinance, which has no substantial relationship to health or safety or morals, is an unconstitutional restriction upon an owner's basic right of the ownership and use of his property, and it cannot be sustained under the theory or principle of "general welfare."

---

DISSENTING OPINION BY MR. JUSTICE JONES:

I agree with the writer of the majority opinion that the rural and suburban communities of our Commonwealth may not ignore the problems we all share with respect to population growth, and that any unjustified attempt by these communities to avoid these problems by exclusionary zoning should be resisted by our courts. However, we must bear in mind that zoning does, most often, have a legitimate and even laudable purpose, and we should not, therefore, hold a zoning ordinance to be invalid if it *does* have a legitimate, nonexclusionary purpose, *particularly where the ordinance is part of an overall plan which is specifically designed to face the problem of population growth.*

William K. Davis, who served on the Delaware County Planning Commission from 1960 to 1966 and was its Executive Director for the last four years, gave his assessment of the new Concord Township zoning plan as follows: "It was adopted by the township to

recognize the need for change and departure from the zoning pattern that preceded this one. The township itself is in a transitory stage of development. There are growth trends, there is new housing in and around the township. *This to me represents an effort to move directly into future growth patterns,* to provide relief and land areas for growth to take place where the township officals think it most appropriate." (Emphasis supplied)

I begin my consideration of this appeal by reiterating the salutary principle of judicial self-restraint in this area of the law set forth in *National Land and Investment Co. v. Easttown Twp. Board of Adjustment,* 419 Pa. 504, 521-22, 215 A. 2d 597, 606-07 (1965) (hereinafter cited as *National Land*) : "The days are fast disappearing when the judiciary can look at a zoning ordinance and, with nearly as much confidence as a professional zoning expert, decide upon the merits of a zoning plan and its contribution to the health, safety, morals or general welfare of the community. This Court has become increasingly aware that it is neither a super board of adjustment nor a planning commission of last resort. [Citing authorities]. Instead, the Court acts as a judicial overseer, drawing the limits beyond which local regulation may not go, but loathing to interfere, within those limits, with the discretion of local governing bodies. [Citing authority]. The zoning power is one of the tools of government which, in order to be effective, must not be subjected to judicial interference unless clearly necessary. For this reason, *a presumption of validity attaches to a zoning ordinance which imposes the burden to prove its invalidity upon the one who challenges it.* [Citing authorities]." (Emphasis supplied) See also: *Bilbar Const. Co. v. Easttown Twp. Bd. of Adjustment,* 393 Pa. 62, 72, 141 A. 2d 851, 856 (1958).

By reason of the technical and factual nature of the issues involved in a zoning appeal, the scope of review of a reviewing court is limited to determining whether the zoning board of adjustment abused its discretion or committed an error of law. *See, e.g., National Land,* 419 Pa. 504, 523, 215 A. 2d 597, 607 (1965); *Cleaver v. Board of Adjustment,* 414 Pa. 367, 380, 200 A. 2d 408, 416 (1964); *Tidewater Oil Co. v. Poore,* 395 Pa. 89, 93, 149 A. 2d 636, 638 (1959). I conclude from my examination of this record that the evidence before the board amply supported its decision to uphold the minimum lot requirements, and, accordingly, I would reverse the order of the court below.

The majority has stated that a zoning ordinance may not be upheld solely because of a sewage disposal problem, that the zoning ordinance presently in question was enacted exclusively to solve such a sewerage problem and, therefore, this ordinance is invalid. If either of the majority's first two points is incorrect, then its conclusion must also fall.

Two Pennsylvania cases have been cited as support for the proposition that sewerage problems cannot, per se, excuse minimum-acreage zoning requirements. In *National Land,* the first of these two cases, the township subdivision regulations authorized the township zoning officer to require lots larger than the minimum as stated in the zoning ordinance if the disposal of sewage so required. This Court held, therefore, that since other means were available to solve any sewerage problem, the township's use of a minimum-lot zoning ordinance was unnecessary and improper. There is no evidence in the instant case which might indicate that Concord Township's authorities have such power, and, accordingly, *National Land* is distinguishable on its facts.

Moreover, the position now taken by the majority, even if it were the same as in *National Land, totally*

ignores intervening legislation which appears to specifically reject the broad proposition as now stated. *National Land* was handed down in 1965, when the applicable state zoning act was the Act of May 1, 1933, P. L. 103, art. XX, §2001, added by Act of July 10, 1947, P. L. 1481, §47, as amended, 53 P.S. §§67001-10. However, this Act was repealed in 1968 and replaced by the Act of July 31, 1968, P. L.    , 53 P.S. §§10601-20.

The former statute listed several objectives which, collectively, delineated the proper purpose for zoning regulations under that statute. 53 P.S. §67003. The comparable section of the 1968 Act reads as follows: "The provisions of zoning ordinances shall be designed: (1) To promote, protect and facilitate *one or more* of the following: . . . sewerage . . . ." 53 P.S. §10604 (Pocket Parts) (Emphasis supplied). The new legislation differs from the 1947 Act in that it specifically states that any *one* of the listed problems may be the basis for a township's zoning ordinance. In contradistinction to the 1968 Act, the majority opinion states that a zoning ordinance may *not* be upheld solely because of a sewerage problem.

The second case cited by the majority as support for the first proposition, as stated above, is *Delaware County Community College Appeal,* 435 Pa. 264, 254 A. 2d 641 (1969). That case, however, dealt with a situation in which the existing sewer facilities could amply handle the proposed facilities. The zoning board there merely anticipated a possible problem at some *future* time, as the result of other expansion which had not yet, in fact, been proposed. In the case at bar, however, the sewerage problem will be caused by *this* application; we do not have a "potential sewerage problem in the future." It should also be noted, parenthetically, that in the *Community College* case the Executive Director of the Delaware County Planning

Commission testified that the proposed use (the college) *would* be consistent with the applicable comprehensive plan, supporting the position of the applicant in that case.[1]

The first proposition suggested by the majority is that the alleviation of a sewage disposal problem cannot, per se, justify a minimum-acreage zoning ordinance. As I have indicated above, this suggestion is not only directly contrary to the most recent state legislation, but it is also without support (as applied to the instant case) in either of the only two cases relied upon as authority in the majority opinion.

The second premise of the syllogism suggested by the majority is to the effect that the Concord Township zoning ordinance was enacted solely to solve a problem of sewage disposal. This point finds no more support in the record than does the first premise in the law. Several other factors were considered by the zoning board and were fully testified to at the hearing. One of these is that the local road network surrounding the tract in question is already taxed to its capacity at certain times of the day. There is but one bus route in the township and no train service, and, therefore, we must assume that any additional residents of the community will use their automobiles for transportation. Moreover, most of the residences surrounding the tract are built on five-acre lots. Two- and three-acre zoning would be more in conformity with the rural and historical surroundings of the neighborhood. Finally, there is no guarantee as to the source of a water supply for the new development. There is a municipal water main 1000 feet from the property but there is no evidence in the record that

---

[1] Compare that situation with the testimony of William K. Davis in the instant case, wherein he *opposes* the position of the applicant. *Supra* at pages 481-2.

this source of water will be available for the new development.[2]

We note in passing that a new zoning map was adopted by the Township while the board was conducting its hearings. Land which had been zoned three acre under the old map, and which constituted 80% of the Township, was reduced in area to 10% of the Township, and the new map also substantially enlarged the one-acre and light industry areas.[3] While this information is not necessarily germane to the instant litigation, it does reveal that the Township is aware of its responsibility to readjust its zoning classifications to meet the needs of an increasing population. Evidence in the record indicates that under the present zoning classification the Township can absorb adequately all population increases until the year 1980. This evidence suggests that the officials of the Township are making a conscientious effort to develop the Township according to a systematic plan, and we should be loath to upset that plan by striking down a zoning classification unless absolutely required to do so.

The real crux of the controversy in this case is indicated by the following statement in the majority opinion: "Finally, we cannot ignore the fact that in the narrow confines of the case before us, Concord Township's argument that three-acre minimum zoning is necessary for adequate on-site sewerage is *patently ridiculous*." (Emphasis supplied) *If*, in fact, there is no support for the Township's contentions on this is-

---

[2] As previously noted, the 1968 Act lists several factors which, individually or collectively, may support a zoning ordinance. In addition to sewage disposal, the Act refers to "coordinated and practical community development, proper density of population, . . . disaster evacuation, transportation, water . . . ." 53 P.S. §10604(1) (Pocket Parts).

[3] By way of contrast, the zoning ordinance involved in *National Land* upzoned the property in question from one to four acres.

sue, *then* it might be argued that the situation does not justify this type of zoning, and we must, therefore, consider the evidence which was offered by the Township and how that evidence is to be judged.

The general rule for determining the constitutionality of a zoning act or ordinance was set forth by this Court in *Colligan Zoning Case,* 401 Pa. 125, 131, 162 A. 2d 652, 654 (1960) : "It is now well settled that zoning acts and ordinances passed under them are valid and constitutional as structural or general legislation whenever they are necessary for the preservation of public health, safety, morals or general welfare, and not unjustly discriminatory, or arbitrary, or unreasonable, or confiscatory in their application to a particular or specific piece of property."[4] The burden of proof is upon the applicant attacking the constitutionality of the zoning act to prove that it does not meet these standards.[5] As the majority has noted, the proper question for a reviewing court is whether the zoning board abused its discretion or committed an error of law in deciding that the ordinance in question is constitutionally sound.

In its determination that the instant petition involves no sewerage problem, the majority opinion totally and unjustifiably ignores *all* the evidence presented on this question by the Township and by the applicant. Whenever we are called upon to decide a complex scientific question, we must rely upon the testimony of experts and give great weight to the scientific conclusions which they reach. Where there is a conflict

---

[4] *See also Exton Quarries, Inc. v. Zoning Bd. of Adjustment,* 425 Pa. 43, 58-59, 228 A. 2d 169 (1967) ; *National Land,* 419 Pa. 504, 511-12, 522, 215 A. 2d 597 (1965) ; *Bilbar Const. Co. v. Easttown Twp. Bd. of Adjustment,* 393 Pa. 62, 72, 141 A. 2d 851 (1958).

[5] *See, e.g., Cleaver v. Board of Adjustment,* 414 Pa. 367, 373, 200 A. 2d 408 (1964) ; *Bilbar Const. Co. v. Easttown Twp. Bd. of Adjustment,* 393 Pa. 62, 70, 141 A. 2d 851 (1958).

between the testimony offered by one side and that offered by the opposing side, the zoning board must consider *both* positions carefully to arrive at its conclusion as to which is correct. However, once the board has made its findings of fact and reached a conclusion, the function of a reviewing court is to examine the evidence before the board to determine whether the board's results are reasonably supported by the facts and by the law. The question is not whether we—at the appellate level—would have reached the same result, but rather whether the zoning board's determination was arbitrary and contrary to the weight of the evidence. *Gilden Appeal,* 406 Pa. 484, 487, 178 A. 2d 562, 564 (1962).

At this point, it is necessary to briefly delineate the means by which the majority has concluded that the possibility of a sewerage problem is "patently ridiculous." I first note that there had been no reference whatsoever in the record, at any stage of these proceedings, to the Pennsylvania Department of Health Regulations until the promulgation of the majority opinion. The majority refers to the scientific opinions contained in these Regulations *as determinative* on the question of whether a sewerage problem exists, although the Regulations were never offered in evidence by either Concord Township or the petitioner. The patent impropriety of basing a decision on these Regulations which are beyond the scope of the record in this case is too clear to require elucidation. It should suffice to merely point out that scientists are continually questioning the opinions and conclusions of other scientists, even those opinions and conclusions which have been legislatively accepted. Therefore, it is extremely important that such evidence be subjected to cross-examination, and that the opposing party (*i.e.,* the Township) be given the opportunity to present rebuttal evidence. These Regulations must certainly carry great

weight in our consideration. Nevertheless, I believe it is improper to base a scientific conclusion solely upon Regulations which have not been referred to by the parties, the zoning board, or the lower court, and where a substantial amount of other evidence *has* been offered with all the safeguards of open-court examination.

Moreover, the Regulations themselves point out the issue which was actually disputed by the parties. According to §7.1-1 thereof, an on-site sewerage system is impermissible *if* the percolation rate in the immediate area is over sixty minutes per inch.[6] The controversy at the hearing in the instant case, and the point on which the parties differ, is whether and to what extent the 140-acre tract in question is comprised of land with a percolation rate of over sixty minutes per inch. It is clear to me that if, as claimed by the Township, a substantial portion of the land cannot support on-site sewerage systems, then we would be dangerously derelict in our duty to protect the citizens of this Commonwealth if we permit this tract of 115 one-acre lots to be built, each lot with its own system.[7] Accordingly,

---

[6] By way of clarification, the percolation test is the most commonly-used means of deciding whether an on-site sewerage system may be safely installed. It tests the length of time required for the soil to absorb water. Generally speaking, if it requires more than sixty minutes for one inch of water to be absorbed, then it is likely that the system will back up and not operate—*i.e.*, the sewage might come to the surface of the land and collect there instead of dissipating.

[7] The majority opinion states that it is "sheer fantasy" to claim, as does the Township, that although a one-acre lot would not support on-site sewage disposal, a three-acre lot would. The witnesses for the Township have simply reasoned that because substantial portions of this 140-acre tract have high percolation rates, it would be possible to lay out three-acre lots, each lot including an area with an acceptable percolation rate, although this could not be done with one-acre lots. I find nothing fantastic about this and, in any case, would be extremely hesitant to adopt any *personal* assessment over the unrebutted testimony of expert witnesses.

we reach what should be the decisive question on this appeal: Can the evidence on the record support the conclusion of the Zoning Board that a substantial portion of this 140-acre tract cannot support on-site sewerage systems?

The only evidence offered by the applicant, Kit-Mar Builders, Inc., on the question of whether this land would be suitable for on-site sewerage systems if divided into one-acre lots, was given by David Clark. Mr. Clark is a professional engineer as well as the president of Kit-Mar Builders, Inc., the applicant. He testified as to the results of thirteen percolation tests which he personally conducted, and these tests indicated that the entire property would be satisfactory for on-site sewage disposal,[8] although Mr. Clark admitted, on cross-examination, that at least seven acres of the tract would not even be suitable for building because the ground was low and wet.

On the question of percolation rates, the Township offered the testimony of Harry H. Curtin, who has been conducting these tests for twenty years and is now the vice president of Roy F. Weston Company, an independent firm of consulting engineers. Mr. Curtin's firm conducted fifteen percolation tests, under his personal supervision. He testified that five of the tests gave completely unsatisfactory results,[9] that seven of the tests indicated the possibility of disposal problems,[10] and that three of the tests "would indicate that on-site systems might work in that particular area."[11]

---

[8] The percolation rates obtained by Mr. Clark ranged from 2.8 minutes per inch up to 26.0 minutes per inch.

[9] The percolation rates ranged from 80 minutes per inch up to 160 minutes per inch.

[10] The percolation rates ranged from 30 minutes per inch up to 50 minutes per inch.

[11] The percolation rates ranged from 12 minutes per inch up to 24 minutes per inch.

By way of summarizing Mr. Curtin's lengthy testimony, I refer to the following exchange on direct examination: "Q. If in fact it was developed into one-acre lots with on-site sewerage systems, what in your opinion would be the results from a sanitary standpoint? A. I would predict that there would be a high percentage of failures within five to ten years after these systems were put into use. Q. And a failure consists of what? A. Failure in a clay soil of this type would probably first mean back-up of sewage into the house or the overflow of these systems into yards and streets." The evidence, therefore, which was offered as to percolation rates was contradictory, although both parties agreed that this was the standard method of measuring the feasibility of installing on-site sewerage systems.

On the question of whether a potential sewerage problem may exist, the Township also offered the testimony of Walter Satterthwaite, a consulting geologist for Roy F. Weston Company. Mr. Satterthwaite utilized a "base map" of the area in question, which map had been prepared by the United States Department of Agriculture. On the basis of criteria established by the Department of Agriculture as guide lines to determine soil acceptability for on-site waste disposal, Mr. Satterthwaite testified as to the extent to which the tract could support on-site sewerage systems. His findings were as follows: 40% of the area would not be acceptable for on-site sewerage; 51½% of the area would normally be all right, but might cause problems at some time; and on 7½% of the area the normal oxidation process would be effective. Mr. Satterthwaite summarized his testimony as follows, on cross-examination: "Q. Now, you aren't saying by your testimony here that any dire consequence would happen to anyone who would possibly end up living on a one-acre lot on this property, are you? A. It very likely could become quite a health hazard. Q. Would you tell me

how, sir? A. By the inability of the soil to accept the effluent or by the altogether too rapid passage of sewage wastes through the soil into the surface of the ground or to the surface of streams and springs that are in the area." The *potential* sanitation threat is compounded by a drainage problem attributable to the steep terrain in the interior of the tract where the land descends to a creek bed.

The Township also offered the testimony of Oliver Armitage, a licensed real estate broker and appraiser for fourteen years. Mr. Armitage stated his professional opinion, based upon the nature of the surrounding area and the market for houses, that "a residential subdivision of two or three acres is the most desirable method of developing this property." In fact, he pointed out that although in a more urbanized area there would tend to be a much greater demand for one-acre lots, in an area such as this 140-acre tract, the market would be stronger for two- or three-acre lots. His testimony agreed with that of William Davis, referred to above, who also pointed out that the present zoning plan would adequately absorb *all* population increases through 1980. No population estimates had been made beyond 1980.

Considering all the evidence before the zoning board, I find it impossible to say that the board was guilty of either an abuse of discretion or of committing an error of law when it upheld this zoning ordinance. The fact that the majority opinion takes no notice of the evidence offered by the Township is particularly distressing because of the "presumption of validity [which] attaches to a zoning ordinance [and] which imposes the burden to prove its invalidity *upon the one who challenges it." National Land,* 419 Pa. 504, 522, 215 A. 2d 597, 607 (1965).

I am well aware that at times minimum-acreage requirements might be a crude way of dealing with a

sewerage problem. Nevertheless, I feel that a potential sewerage problem may be a very important factor to be considered in evaluating a zoning ordinance, particularly in the light of the 1968 Zoning Act. Of course, if we hold that a potential sewerage problem is one factor to be considered, we might well be encouraging certain municipalities which desire to maintain high-acreage requirements to drag their feet as far as constructing municipal sewerage systems is concerned. If this appears to be the case, then in evaluating such a zoning ordinance we would be forced to discount the potential sewerage problem. On the other hand, we should not say that the sewerage problem must be overlooked entirely. Concord Township has no municipal sewerage system. If we strike down this zoning ordinance and if the sewerage problem is such that on-site systems would not be feasible, then the Township will be forced to incur the expense of installing a municipal system. Rural and suburban townships have relatively limited tax resources for the obvious reason that they are composed primarily of single-family residences, properties which do not yield high real estate tax revenues. To require these municipalities to incur the great expense of installing sewerage systems and to augment their limited municipal services to meet a population which is increasing more rapidly than anticipated, does not appear to me to be a sound way to face what is admittedly a serious problem of providing residential communities for a rapidly-growing population.

I dissent.

Mr. Justice COHEN joins in this dissenting opinion.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

While agreeing in the main with the dissenting opinion of Mr. Justice JONES, I deem it desirable to make

a brief separate explanation of the reasons I am unable to concur in the majority opinion.

*Bilbar Const. Co. v. Easttown Twp. Bd. of Adj.*, 393 Pa. 62, 141 A. 2d 851 (1958) was a decision upholding the validity of a one-acre minimum size lot in an opinion written by Chief Justice CHARLES ALVIN JONES. (Mr. Justice, now Chief Justice, BELL dissented at length, and was joined by Justice MUSMANNO and Justice BENJAMIN R. JONES.) *Bilbar* seems to me to have been a wise opinion in the delicate area of judicial versus legislative prerogatives. Said the Court: "While the promotion of the public health, safety, morals or general welfare is the test for checking subjectively whether a municipality's exertion of its constitutional power to zone has been exceeded, courts do not apply the criteria in a vacuum. Someone must be injured by the ordinance's restrictions in order to raise the constitutional question, and the applicable objective test is whether the ordinance operates in an arbitrary, capricious, discriminatory or confiscatory manner as to the property of the complainant. The latter inquiry calls for judicial determination. But, as to the former, what serves the public interest is primarily a question for the appropriate legislative body in a given situation to ponder and decide. And, so long as it acts within its constitutional power to legislate in the premises, courts do well not to intrude their independent ideas as to the wisdom of the particular legislation. *Specifically, with respect to zoning enactments, judges should not substitute their individual views for those of the legislators as to whether the means employed are likely to serve the public health, safety, morals or general welfare.*" (Italics supplied.) p. 72.

The Court in *Bilbar* reiterated the presumption of constitutional validity that attends legislative enactments, including those of municipal bodies in the form of ordinances, and the rule that "the burden of proof,

when legislation is under attack on constitutional grounds, is on the one so asserting and never shifts." The Court went on to observe: "Even where there is room for difference of opinion as to whether an ordinance is designed to serve a proper public purpose, or if the question is fairly debatable, the courts cannot substitute their judgment for that of the authorities who enacted the legislation." (Citing cases.) pp. 71-2.

*National Land and Investment Company v. Easttown Township Board of Adjustment,* 419 Pa. 504, 215 A. 2d 597 (1965), a decision with which I agree, struck down as unconstitutional, under the facts there prevailing, a four-acre minimum lot size. In so doing, the Court cited *Bilbar* approvingly several times, and acknowledged that "The zoning power is one of the tools of government which, in order to be effective, must not be subjected to judicial interference unless clearly necessary. For this reason, a presumption of validity attaches to a zoning ordinance which imposes the burden to prove its invalidity upon the one who challenges it." (pp. 521-22) Addressing itself to the requirement of a minimum area for residential building, the Court said: "There is no doubt that in Pennsylvania zoning for density is a legitimate exercise of the police power. [Citing *Bilbar* and *Volpe Appeal,* 384 Pa. 374.] Every zoning case involves a different set of facts and circumstances in light of which the constitutionality of a zoning ordinance must be tested. Therefore, it is impossible for us to say that any minimum acreage requirement is unconstitutional per se." (p. 523) Yet it is difficult to see, in light of the majority opinion in the case at bar, how any minimum acreage requirement for suburban residential use in excess of one acre can henceforth be sustained. Any minimum lot requirement is, almost by its name, exclusive in some degree in purpose and effect. Indeed, if the minimum lot size in the present case had been one acre, and the

appellee had planned to develop the tract in question in ¾ acre lots, or ½ acre lots, the reasoning of the majority opinion would appear to be equally applicable to permitting such use. Perhaps it is significant that the majority opinion in the case at bar does not cite *Bilbar* a single time.

In all previous zoning cases, the Court has put the burden of proof on the challenger of the legislation involved. By the present decision the Court appears to reverse the burden, and says that "Absent some extraordinary justification, a zoning ordinance with minimum lot sizes such as those in this case is *completely unreasonable.*" The majority then holds that the Township has not shown such extraordinary justification for its 2 and 3 acre minimum lot size requirements, and that such requirements are accordingly unconstitutional. The rationale of this holding appears to be that Concord Township is "unnaturally limiting its population growth through the use of exclusive zoning regulations," with the result that "the people who would normally live there will inevitably have to live in another community."

The record, as I read it, does not indicate that the appellee sustained its burden, assuming it still had one, of showing unconstitutionality. If the burden has now shifted to the municipality to justify its minimum requirement, I think it was sufficiently met, though probably not by showing any justification which the majority would say was "extraordinary."

The record shows, to my satisfaction at least, that Concord Township, heretofore an essentially rural area, has been aware of a responsibility to deal with the problem of population growth, and has responded constructively. Rather than executing a "retreat behind a cover of exclusive zoning," it has liberalized its ordinance to make it less exclusive, changing the three acre minimum from 80% to 10% of the total land area and

substantially increasing the area zoned for one acre or less; rather than "attempting to zone out growth at the expense of neighboring communities," it has projected its growth pattern for the next decade, and charted its zoning pattern to accommodate it;[1] rather than using a waste disposal problem as "a thinly veiled justification for exclusionary zoning," it has presented, as but one relevant factor, competent testimony to indicate that 40% of the tract in question is, because of topography and soil composition, in an area of "severe limitation" for on-lot sewage disposal.

It is true that Concord Township has not utilized the Planned Unit Development technique approved by the Court in *Village 2 at New Hope, Inc. Appeals,* 429 Pa. 626, 241 A. 2d 81 (1968), but it is also true that it has appointed a Township Planning Commission which since 1966 has been engaged, with the help of a community planning consultant, and in conjunction with the Delaware County Planning Commission, in planning for land use development, including feasibility studies relative to water supply and sewage disposal. This process is not complete. Indeed, the Township properly recognizes that planning is a continuous process. In the words of the Township's consultant, William K. Davis, "The Township is endeavoring to embark on a full, new, comprehensive planning program which I am . . . confident will lead to new proposals in land use, new development areas perhaps, variety of other things. Because the Township is in this period of transition, I think the town must be guarded against the development of parcels at random . . ."[2]

---

[1] The Township's 1966 population was 4,081 persons. It is anticipating a growth by 1980 of more than double, to 8 to 10 thousand.

[2] Professor Sager, in his interesting article cited several times by the majority opinion (Sager, "Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent," 21 Stanford L. Rev.

Our function on this appeal, where no additional testimony was taken by the lower court, is to look at the decision of the Board of Adjustment to determine if in upholding the constitutionality of the two acre and three acre minimum zoning, the Board committed an abuse of discretion or an error of law. My reading of the record satisfies me that it did not. *National Land's* substantive holding, as now stated by the majority, is that the existence of alternative methods for dealing with problems attendant upon population growth forbids zoning which has "an exclusive purpose or effect." It appears that in the case at bar the Township has been exploring the alternative methods, and has made its zoning less exclusive as part of a conscious effort to absorb the population thrust which it anticipates. That the particular tract here involved is zoned two and three-acre minimum lot size does not demonstrate the contrary, or even that the appellee developer would have to go to another community, since one acre, or less, zoning is available in the Township.

I would reverse the decree of the Court below and reinstate the decision of the Board of Adjustment.

Mr. Justice JONES joins in this dissenting opinion.

---

767, 797 (1969) acknowledges that "The restraint on the number of households effectuated by large-lot-size restrictions is a restraint on the total demand for [public] services and may permit the more rational and systematic absorption of new residents." He goes on to state his conviction that "this argument implies a planned and controlled change of the affected area, not a firm posture of opposition to change."