## Shinn v. Lower Merion Township Zoning Hearing Board

*Justin G. Duryea*, for protestants-appellants.

*Thomas J. Burke*, for owner.

*Robert S. Ryan* and *William H. Kinkead, 3rd*, for zoning hearing board.

SMILLIE, J., June 16, 1972.—Gladys DeH. Shinn, William Shinn, Ann O'Brien, John B. O'Brien and Frank Titlow, protestants, appealed from an order of the Lower Merion Township Zoning Hearing Board granting applicant, Margaret Laughead, a variance to demolish an existing Atlantic Richfield Gasoline Station and a dilapidated two-family home at 351 Conshohocken State Road in order to erect in its place an environmentally improved, structurally attractive gasoline station.

351 Conshochocken State Road, owned by Margaret Laughead and leased to Atlantic Richfield Company, is on the southeastern corner of Conshohocken State and Youngs Ford Road in Gladwyne, Lower Merion Township, Montgomery County, Pa.

The south corner of the intersection is zoned

"C-2" commercial with a Sunoco Gasoline Station and an A. & P. Supermarket; the east, along Conshohocken State Road, is vacant; farther to the east is an electric substation, and the area to the north of applicant's property is residential. The west and north corners of the intersection have a Catholic Church and a former Baptist Church, now used as a scout headquarters.

Since the first issue raised in the instant appeal relates to the nature of the use at 351 Conshohocken State Road, the unusual history of that use and its intimate relation to the original use of the adjacent property, 1105 Youngs Ford Road, is necessary to properly recognize the peculiar circumstances of the case. Youngs Ford Road property and Laughead's Conshohocken State Road property are contiguous, but represent the basis for the legal dispute.

In 1926, J. D. Laughead, husband of Margaret Laughead, operated a gasoline station on premises 1105 Youngs Ford Road, adjoining the property herein involved. Neither R-6A nor R-4 zoning classifications permit a gasoline station use, and the major part of the property has been zoned R-6A and R-4 *since 1927.* In 1927, Lower Merion zoned 1105 Youngs Ford Road residential, but because the use as a gasoline station at 1105 Youngs Ford Road was in operation *before* the ordinance, the gasoline station became a nonconforming use.

The gasoline station continued to operate at 1105 Youngs Ford Road until 1936. The business was profitable and popular with the automobile traffic. It was the only service station in Gladwyne or in a large area of that region. It served the residents of Gladwyne, as well as the through traffic on Conshohocken State Road. By 1935, the location presented problems not only to the owner but also to Gladwyne residents. The pump stands were on the edge of the

roadside. Cars being serviced were required to stop in the road, thus blocking traffic, and, in effect, making Youngs Ford Road a one-way street. Travelers on Conshohocken State Road who desired service were required to turn onto Youngs Ford Road, block the roadway, and pass through residential streets they otherwise would have avoided. The congestion was inherent in the success of the gas station. The difficulty presented by location on Youngs Ford Road had not been foreseen at the time the ordinance was passed or at the time the operation was begun. The nation was emerging from the horse and buggy stage of its existence and zoning was a novelty. The concept of orderly community development was in its nascent state.

By 1935, the impact of the automobile on our countryside was recognized. Laughead, in order to alleviate the congestion and hazards inherent in the location of his station on Youngs Ford Road, purchased 351 Conshohocken State Road located at the corner next to 1105 Youngs Ford Road. He sought to move the gasoline station 75 feet to a location better suited for both the property owner, the traveling public and the community.

Laughead then applied to the zoning board for permission to locate his station 75 feet from 1105 Youngs Ford Road to 351 Conshohocken State Road. On February 29, 1936, the board granted a "variance" to accomplish the relocation of the station. There was not a word of protest nor unanimous approbation from the community. It was a highly desirable move for everyone.

Following the removal of the station to 351 Conshohocken State Road, 1105 Youngs Ford Road was returned to residential use.

*Since its relocation in 1936, the gas station has*

*continuously* operated at 351 Conshohocken State Road.

The present board found that the gasoline station at 351 Conshohocken State Road is a nonconforming use and that the effect of the 1936 variance was to move the nonconforming use to the adjoining property, there being no basis for the grant of a variance. In so finding, the board underscored two facts which it believes influenced the 1936 board:

"First, this was not the typical case involving the expansion of a non-conforming use onto 'new' property. Mr. Laughead actually relocated the gasoline station from one lot to another and then demolished the first gasoline station. The original property was returned to residential use. Second, moving the gas station to a corner lot *aided the orderly development of the community* by locating the gas station at an intersection, rather than on a lot fronting on only one street and completely surrounded by residences. Had the Laugheads remained at their original location, their gasoline station would now be located between two residential areas along a street which is entirely residential except for the station. The corner property would have been totally useless for residential purposes because of its location between the gasoline station and Conshohocken State Road." (Italics supplied.)

Protestants contend that the use of 351 Conshohocken State Road is a variance use and the board erred in finding the use of the subject property a "nonconforming use" because a nonconforming use cannot be relocated by variance.

Since no additional testimony was taken, our review is limited to a determination of whether the board abused its discretion or committed an error of law in characterizing the use as a nonconforming one: Con-

cord Township Appeal, 439 Pa. 466 (1970); Walter v. Philadelphia Zoning Board of Adjustment, 437 Pa. 277 (1970).

While it is true that the use of 351 Conshohocken State Road, when considered unconnected with the facts and history of the area is not a nonconforming use as that term is usually defined, since the use did not exist at *that spot* prior to the zoning ordinance, it has the full status of a nonconforming use. It is an anomaly because of the peculiar history of the use and the 75-foot relocation of the station which factually had the status of a nonconforming use. The relocation 75 feet did not change the situation for the community except to improve it.

The unique history of the two properties makes it impossible to consider 351 Conshohocken State Road in isolation from 1105 Youngs Ford Road. The dilemma faced by the property owner and the community was as clear in 1936 as it is today. The gasoline station at 1105 Youngs Ford Road was a legally existing nonconforming use which could have continued to exist there ad infinitum unless it came to constitute a nuisance or was abandoned.

At 1105 Youngs Ford Road, the station was a detriment to travelers and to the community which was becoming increasingly aware of the need for orderly improvement. The relocation of the pumps 75 feet was to the owner's advantage but much more so to the advantage of the traveling public and the community.

The relocation did, in fact, contribute tremendously to the planned development of the community. It reduced the congestion on Youngs Ford Road and the additional automotive transit through residential streets. It returned the Youngs Ford Road to exclusively residential uses. It located the gasoline station

on a corner property at a controlled intersection along a heavily traveled highway. The gas station is across the street from and facing commercial establishments.

Though we need not decide whether the 1936 variance would be granted today, we find nothing in the law of 1936 which would have prevented the relocation of the nonconforming use.

The law at that time was far from crystalized. The lack of settled guidelines of law in zoning cases at that time is readily understandable when it is considered that the first enabling legislation in Pennsylvania was not enacted until 1923, 13 years before the decision of the Lower Merion Zoning Board in the case at bar. The ordinance in question was adopted only nine years before the variance.

Nonconforming uses, despite their disruption of community development, were viewed with indulgence in Pennsylvania and their right to continued existence and reasonable expansion was early given constitutional sanction under the due process clause. In Gilfillan's Permit, 291 Pa. 358, 362 (1927), the court stated:

"Petitioner's business had been established at its present location long before the passing of the zoning ordinance and was actively conducted at the time the ordinance went into effect; accordingly, as the property was then used for lawful purposes, the city was without power to compel a change in the nature of the use, or prevent the owner from making such necesary additions to the existing structure as were needed to provide for its natural expansion and the accommodation of increased trade, so long as such additions would not be detrimental to the public welfare, safety and health."

By 1936, few cases existed to explain the extent or meaning of the doctrine of natural expansion or

to guide zoning boards in the determination of what could be done by the owner of a nonconforming use.

The uncertainty of the law on variances was also acute as the following excerpt from an article written in 1948 reveals:

"One of the most active yet unsettled fields of municipal law is that of zoning . . .

"Not the least confusing area of administrative zoning is the discretionary granting of variances by an administrative body called the zoning board of adjustment . . .

"The zoning enabling acts have set the initial *word* standards as to what a property owner must show and what a board of adjustment must find in order that the requirements for granting a variance may be met. The petitioner has to show that 1) a literal enforcement will result in unnecessary hardship to himself; and 2) the granting of the variance will not be contrary to the public interest. It is in meeting the first requirement that variance seekers have the most difficulty. The courts have never given a satisfactory enunciation of what constitutes 'unnecessary hardship' within the meaning of the acts, undoubtedly because of the newness of zoning and the peculiar nature of zoning cases which can be decided only as narrow holdings limited to given fact situations. Until many more cases have been passed on by our upper courts, 'sufficient hardship' cannot be defined with certainty. However, from an inspection of the few upper court decisions and the many more common pleas decisions, one may perhaps *guess* as to what the law is." (Italics supplied.)

Note: "Discretionary Powers of Zoning Boards of Adjustment in Pennsylvania", 97 U. Pa. L. Rev. 68 (1948).

In other words, zoning law, like Topsy, "jes growed."

In the instant case, the hardship claimed by Laughead with regard to not using 351 Conshohocken State Road was to demonstrate great hardship with regard to 1105 Youngs Ford Road upon which the gasoline station was then located. A variance permitting the removal of the gas station to 351 Conshohocken State Road was a practical solution and one which was not forbidden by the law in 1936. No appeal was taken from the grant of the variance and the acquiescence of the township and the approval of the neighbors is some evidence of the interpretation of the law which then existed.

The trend of all law today is to do away with the mere magic of words and to regard the essence. Defendants in criminal cases are permitted to have their habeas corpus petitions treated as post conviction petitions and vice versa. If the serious effects of criminality can be treated so generously, what possible harm can result from recognizing the actions of a 1936 zoning board in allowing the removal of the nonconforming use by variance when the guidelines for a variance were unchartered. It would not really be harsh from a community standpoint but it would fail to recognize the basic purpose of all zoning, i.e., improve the community. Merely for the sake of indulging in semantics, we should not ignore the benefits which the community has derived from the relocation and which it will derive from the relocation and which it will derive from its modernization. It is absurd to deal in hindsights of terminology 36 years later to castigate the designation of a practical solution of a mushrooming problem. The owner could not be deprived of his legitimate use. The community did not want it removed. The traveling public would have been sorely deprived if the station were not there. What was a

blight is now to be an attraction; what was a hazard to the motoring public is now to be a safety measure; what was a congested eye-sore is now to be an efficient, quiet, functional necessity.

To view the infant, stumbling stages of zoning from its far more experienced promulgation 36 years later is manifestly unfair to the property owner, the automobile user and the residential neighborhood involved.

The board has broad discretion in applying the bare guidelines of the statutory law to particular factual situations. The board must, within the statutory framework, fashion solutions to the problems created by troublesome areas.

It is within the limits of the board's discretion, now, in 1972, to look back to the realities of 1936 as an aid in characterizing the gasoline station use. The board found that there was no possible basis for the grant of the 1936 variance other than the theory of relocating the nonconforming use, even under the less clearly defined law of 1936. We agree with the board's conclusions.

The existing structures which occupy over 40 percent of the land fail to conform to the yard requirements for R-6A residential areas. There are not front or rear yards, no side yard on the north and a side yard of only 18 feet on the east.

Since the property is very irregular in shape and has a total area of only 9,900 square feet, complete compliance with yard requirements would cause the greatest difficulty. The floor space for a building conforming with yard requirements would be only 15 by 50 feet or 750 square feet. Such a building would be impractical.

The proposed structure which will occupy only two-

thirds of the land which the present structures occupy will bring the property closer to compliance with yard requirements.

The present station, having been subjected to 36 years of intensive use, is antiquated, run down and unattractive. It has been correctly referred to as a blight upon the neighborhood. The pump stands are located in the right-of-way. There are no curbs or sidewalks and no place for cars waiting to be serviced except lined up into the traveled portion of the highway.

The house extends out into the right-of-way and interferes with visibility at the intersection. It constitutes a traveling danger. It is not only ugly but hazardous for all highway uses.

The result of the action of the board is to create an attractive, modern facility which conforms in appearance to the quality of the neighborhood, to move the station building farther from the nearest residential property, to have the station face Conshohocken State Road and commercial establishments there, to decrease the yard violations; to increase visibility at the intersection, facilitate and expedite the flow of traffic and reduce the hazards of fire. The plan is definitely beneficial and sensible. We can find no abuse of discretion in the board's determination to that effect.

The case is unique.

The treatment of the use as nonconforming will not be detrimental or in any way render the zoning law or planned development of Lower Merion meaningless. The use existed prior to the ordinance and has continuously existed since its passage. The use has at all times been nonconforming and has been so considered.

The doctrine of natural expansion of nonconform-

ing uses was first promulgated in Gilfillan's Permit, supra, and has, ever since Gilfillan's Permit, been affirmed by the Supreme Court of Pennsylvania. In Silver v. Zoning Board of Adjustment, 435 Pa. 99, 101, 102 (1969), the Supreme Court noted:

"The doctrine of natural expansion was promulgated by this Court some forty years ago: . . .

"Since that date the rule has been reiterated by this Court in several decisions. The rationale behind the doctrine can be traced to the due process requirements protecting private property. If a person owns property which constitutes a valid nonconforming use, it is inequitable to prevent him from expanding the property as the dictates of business or modernization require."

The right of natural expansion is a constitutional right protected by the due process clause: Silver v. Zoning Board of Adjustment, supra. In Upper Darby Township Appeal, 391 Pa. 347, 354, the Supreme Court stated:

"If we were to prevent the natural growth and expansion of a protected nonconforming use, we could invade the constitutional guarantees of due process which indeed brought the nonconforming principle into being."

The natural expansion of a nonconforming use, however, is not without limitation, since it may not be detrimental to the public health, safety and welfare and though the municipality may not prohibit natural expansion per se, it has the right to impose reasonable restrictions on expansion: Silver v. Zoning Board of Adjustment, supra; Humphreys v. Stuart Realty Corp., 364 Pa. 616 (1950); Philadelphia Art Alliance v. Philadelphia Zoning Board of Adjustment, 377 Pa. 144 (1954).

Here, the owner seeks to expand the nonconforming use so as to encompass the entire lot upon which the use currently occupied only a segment.

There are no express area limitations on expansion in the Lower Merion zoning ordinance. The expansion here is reasonable and not detrimental to the health, welfare and safety of the community.

In the Peirce Appeal, 384 Pa. 100 (1956), the owner of a nonconforming use sought a building permit for the construction of a 30 by 40 foot addition to his garage consuming 725 square feet used, by 425 square feet not previously used. The court directed the zoning administrator to issue a permit for the erection of the building to encompass the 425 square feet upon application for a variance, stating, at page 106:

"If the use of such additional property is reasonably necessary in order to accommodate the requirements of the natural growth of the business, the appellant's remedy would be by way of a variance, the requisites for which are hardship to the owner if not allowed to so use his property and want of detriment to the public interest if used in the manner proposed . . ."

Again, protestants contend that the board acted unlawfully in permitting the extension of the nonconforming use because, they say, such extension violated article XXI, sec. 2100(2)(a), of the Lower Merion zoning ordinance which provides:

"A nonconforming use of a building may be extended throughout the building if no structural alterations are made therein, provided that such extension may include structural alterations when authorized as special exceptions."

The term "structural alteration" is defined in section 200(29), as follows:

"Any change in or addition to the *supporting* or structural members of a building, such as the *bearing*

*walls*, partitions, columns, beams, or girders, or any change which would convert an existing building into a different structure, or adopt it to a different use, or which in the case of a nonconforming use, would prolong the life of such use."

Reading the definition of "structural alteration" together with section 2100(2)(a), it is apparent that section 2100(2)(a) is not applicable to the instant situation.

In the Peirce Appeal, *supra*, the Pennsylvania Supreme Court held that a provision of the zoning ordinance of the Borough of Beaver which forbade structural alteration of an existing building was inapplicable to the erection of a building to house parts of a nonconforming use conducted on an open-air portion of the lot, not previously employed for the nonconforming use.

The mere silence of the ordinance on the question of demolition of old buildings and the erection of new ones cannot be read as a limitation on the right of the nonconforming owner. In fact, the total impact of the provisions of the ordinance expressly treating nonconforming uses is to the contrary. A building used for a nonconforming use may be altered to the point where the existing building is converted into a different structure or in a manner which would prolong the life of a nonconforming use therein. It is reasonable to conclude that the owner may erect new facilities to house a part of his nonconforming use.

The case of Hanna v. Board of Adjustment, 408 Pa. 306 (1962), cited by protestants, is inapposite. In Hanna, the owners of a nonconforming used car business sought to demolish buildings then existing on the land and to erect a gasoline station. The Supreme Court, reviewing the board's refusal to grant a permit for this purpose, held that since structural

alterations were not permitted unless ordered by a public officer to assure the safety of the building, then, a fortiori, a new building could not be erected.

Here, however, structural alterations are permitted and any light which the instant ordinance provision sheds upon the situation is favorable to applicant's position, particularly when one reviews the extent to which structural alteration is permitted.

In Peirce Appeal, supra, the Supreme Court held that the inclusion within the walls of a proposed building of 425 additional feet not previously used in connection with a nonconforming use could be done upon the grant of a variance.

A nonconforming use, an important factor to be considered in the determination of hardship, Mack Zoning Appeal, 384 Pa. 586 (1956), exists here and has existed for the past 36 years.

The case herein represents a unique factual situation and an unusual zoning question which does not fall into any of the formalized categories yet decided.

It is unlikely to occur again and the law, being a living instrument, must try to benefit the community, protect the property of all, without distorting the precedents existing. The Lower Merion board has done it and we agree with its findings.