Breitel, J. (dissenting).
The limited powers of district zoning and subdivision regulation delegated to a municipality do not include the power to impose a moratorium on land development. Such conclusion is dictated by settled doctrine that a municipality has only those powers, and especially land use powers, delegated or necessarily implied.
But there is more involved in these cases than the arrogation of undelegated powers. Raised are vital constitutional issues, and, most important, policy issues trenching on grave domestic problems of our time, without the benefit of a legislative determination which would reflect the interests of the entire State. The policy issues relate to needed housing, planned land development under government control, and the exclusion in effect or by motive, of walled-in urban populations of the middle class and the poor. The issues are raised by a town ordinance, which, as one of the Appellate Division Justices noted below, reflect a parochial stance without regard to its impact on the region or the State, especially if it become a valid model for many other towns similarly situated.
Because the issues are so important they must be restated in this court, although the opinions in the Appellate Division cover every issue involved and do so without neglecting any of the legal, economic, or social considerations relevant. A reading of them is desirable and what is said now will assume that what was said once, and said well, need not be repeated in detail.
The Town of Ramapo, following an intensive study by highly-competent experts, amended its zoning ordinance by adding to it section 46-13.1, a section with extensive scope and detailed provisions. It broadly defines a developer as any landowner who proposes to erect and sell a dwelling or dwellings for *384 residential use.* Regardless of the district zone, any proposed development, as so broadly defined, is forbidden unless a special permit is obtained. Permits will be granted only if the land qualifies for enough assigned points under some five categories of available municipal facilities, namely, sewerage, drainage, park-recreation-public school facilities, roads, and firehouses. The purpose is to prohibit development until an acceptable level of supporting facilities exists. The town has committed itself, it is said, by its capital budget and capital improvement plans to insure eventual availability of supporting facilities. But in some areas this eventuality will not be realized for 18 years. To prevent undue delay, the town allows for a crediting of points based on the scheduled improvements even if the town program should not be realized as planned, because of fiscal, economic, or political impediments. Because the effect of the ordinance is to freeze an owner’s use for varying periods of time, up to 18 years, the town also allows the owner to apply for a reduction in tax assessments.
It is important to note how radically the Ramapo scheme differs from those used and adopted under existing enabling acts. The zoning acts, starting from 50 years ago, based on national models, provided simply for district zoning to control population density and some planning to protect preferred uses of land, such as single-family dwellings, from other uses considered less desirable or even harmful to residential living or environmental balance. Since the beginning, in this State and elsewhere, by amendment to the enabling acts by the Legislature, provision has been made for subdivision planning and, *385 in some instances, planned unit development, to prevent large-scale developers from dumping homes wholesale in raw land areas without private and, to some extent, public facilities essential to the use of the homes. In more recent years, since World War II, the need for a much enlarged kind of land planning has become critical. The evils of uncontrolled urban sprawl on the one hand, and the suburban and exurban pressure to exclude urban population on the other hand, have created a massive conflict, with social and economic implications of the gravest character. Throughout the nation the conflict has risen or threatened and solutions are being sought in careful, intensive examination of the problem affecting those within and those without the localities to be regulated.
The President’s National Commission on Urban Problems has made relevant recommendations, the American Law Institute is engaged in drafting a model land development code, and, in this State, the Office of Planning Coordination is working on a planning code. The conflict has surfaced in other States in efforts by municipalities to cut their own swaths in solving their difficulties, and, in every instance uncovered, the courts have struck down the efforts as unconstitutional or as invalid under enabling acts much like those in this State (National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, 524-533; Concord Twp. Appeal, 439 Pa. 466, 469-478; Oakwood at Madison v. Township of Madison, 117 N. J. Super. 11, 14-22; Girsh Appeal, 437 Pa. 237, 240-246; Bristow v. City of Woodhaven, 35 Mich. App. 205; Lakeland Bluff v. County of Will, 114 Ill. App. 2d 267, 275-280). Generally, there is the view that the conflict requires solution at a regional or State level, usually with local administration, and not by compounding the conflict with idiosyncratic municipal action (see ALI, Model Land Development Code [Tent. Draft No. 2, April 24, 1970], pp. xvii-xx; Model Land Development Code [Tent. Draft No. 1, April 24,1968], pp. 189-195; New York State, Office of Planning Coordination, Planning Law Revision Study, Study Document No. 1, April 1969, at pp. 1-3; Report of National Commission on Urban Problems, pp. 208-217, 222-224, 235-240). The Ramapo ordinance flies in the face of and would frustrate these well-directed efforts.
*386 Decisive of the present appeals, however, is the absence in the town of legislative authorization to postpone growth, let alone to establish unilaterally phased population levels, through the expedient of barring residential development for scheduled periods of up to 18 years. It has always been the rule that a municipality has only those land use powers delegated or necessarily implied (1 Anderson, American Law of Zoning, § 3.10). Existing enabling legislation does not grant the power upon which the Ramapo ordinance rests. And for policy reasons, one should not strain the reading of the enabling acts, even if straining would avail, to distort them, beyond any meaning ever attributed to them, except by the ingenious draftsmen of the Ramapo ordinance.
The enabling acts for the several classes of municipalities in the State are substantially alike. They followed the model acts drafted by the U. S. Department of Commerce in the 1920’s, after an earlier zoning effort by New York City in 1916 (Report of National Commission on Urban Problems, p. 200; see L. 1916, ch. 497). Since then they have been amended, usually in identical fashion, as the need for broader powers was envisaged and accepted. Article 16 of the Town Law is the enabling act for towns. Section 261 in pertinent part provides : [1] ‘ For the purpose of promoting the health, safety,
morals, or the general welfare of the community, the town board is hereby empowered by ordinance to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes;”. This is a typical district zoning provision. It grants power to define permissible physical characteristics of land and structure; and says nothing about exercising control in time. The town would stretch the reference to “density of population” to give the town the powers it purports to exercise by the ordinance. Section 263, defining the purposes of district zoning, by any standard of statutory construction provides no help. The section reads: [1] ‘ Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets, to secure safety from fire, flood, panic *387 and other dangers; to promote health and general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality.” It does not broaden powers granted. Instead it is intended to be restrictive in two ways: first, by making certain that zoning regulations conform to a master plan; and second, by relating them directly to specified public purposes. In short, district zoning is permitted if, and only if, it is pursuant to a comprehensive plan and it serves the purposes listed (cf. Udell v. Haas, 21 N Y 2d 463, 469).
Going beyond district zoning, the statute provides for subdivision platting (§ 276 et seq.). It does not provide support for the procedures essayed in the Ramapo ordinance. But what is important is that even intensive subdivision regulation was required to be authorized by statute before towns could control subdivision developers. Statutory authorization was all the more important because the then drastic regulation required the developers to provide private and public facilities for the wholesale distribution of homes and to provide moneys and bonds to make sure that they performed as promised. Notably, no developer is forbidden to develop for a period of years.
The urgent need to control the tempo and sequence of land development has been recognized by courts, government commissions, and commentators (see Cutler, Legal and Illegal Methods of Controlling Community Growth, 1961 Wis. L. Rev. 370; Fagin, Regulating the Timing of Urban Development, 20 Law & Contemp. Prob. 298; Report of National Commission on Urban Problems, pp. 245, 251; New York State, Office of Planning Coordination, Planning Law Revision Study, Draft Outline, pp. 13, 17). Techniques to control the rate, nature and sequence of community development are plentiful although not all are presently authorized or comport with constitutional limitations. Thus, in Albrecht Realty Co. v. Town of New Castle (8 Misc 2d 255) the Town of New Castle in Westches *388 ter County sought to control growth hy placing a moratorium on the issuance of building permits for unspecified periods and with no apparent object other than controlling growth. The measure was voided because the enabling act did not authorize “ a direct regulation of the rate of growth ” (at p. 256). For another technique, in California the purchase of “ development rights ” or a time-limited easement by the local government reportedly has been employed. The community is saved the expense of purchasing the fee simple of the owner. It obtains flexibility by the power to release land for development while landowners are compensated. The method is also said to justify assessing or taxing the owner at a lower rate (see Cutler, op. cit., supra, at p. 894). A similar approach is followed in England and has been recently recommended by the President’s National Commission on Urban Problems (Report, at p. 251; Mandelker, Notes from the English: Compensation in Town and County Planning, 49 Cal. L. Rev. 699; see, also, Ann. Zoning—With Compensation, 41 ALR 3d 636).
A common technique is minimum area zoning. If it does not amount to prohibitory zoning, minimum lot réquirements may bfe used to regulate the tempo and sequence of land development (see Matter of Josephs v. Town Bd. of Town of Clarkstown, 24 Misc 2d 366). Unfortunately, however, the method is often used as an exclusionary or prohibitory device.
Finally, there is the technique sought to be exercised by Ramapo — a technique partaking somewhat of the motivation for and methods used in holding zones.
Holding zones, that is, areas reserved for future development, if legislatively authorized and carefully circumscribed, can validly and effectively implement land planning. Both the interests of localities and the broader interests of the. State and its large metropolitan areas can be reconciled. Indeed, it has been suggested by the National Commission on Urban Problems that enabling legislation grant communities such power. The devising and authorization of new powers, one of which is to create holding or delayed development zones, is a chief concern of the State Office of Planning Coordination. Indeed, it plays a prominent role in its proposed legislation. Notably, in delayed development schemes limitations are invariably suggested, limitations absent in the Ramapo ordinance (e.g., 3- to *389 5-year limits, regional and State agency review, provision for compensation). Such limitations may be essential if the delegation is to be valid constitutionally. Aside from considerations of unlimited delegation, without the standards which universally circumscribe the conduct of administrative agencies, the limitations reflect basic doctrine that even the State’s zoning power is not unlimited. As observed by the Pennsylvania Supreme Court, “ Zoning is a means by which a governmental body can plan for the future — it may not be used as a means to deny the future ” (National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, supra, at p. 528). Again, in Concord Twp. Appeal (439 Pa. 466, supra), it observed, “ Communities must deal with the problems of population growth. They may not refuse to confront the future by adopting zoning regulations that effectively restrict population to near present levels ” (at p. 474).
Either by legislation limited by decisional rule, or by decisional rule alone a limited amount of restraint in time has been held valid in controlling development, even without compensation. Thus, in the State of Washington it was suggested that the legislatively authorized right to impress “ holding zones ” on private property beyond the immediate reaches of present development, must be reasonably limited in its duration (State ex rel. Randall v. Snohomish County, 79 Wn. 2d 619; see, also, Westwood Forest Estates v. Village of South Nyack, 23 N Y 2d 424, 428-429). Significantly, the time limitations should be brief, or reasonably fixed, and justified by emergency or statutory authorization.
It is not necessary now, as observed later, to confront the serious constitutional issues raised by mandatory delayed development. The crux of the matter in these cases is that before wrestling with the constitutional issues the Eamapo ordinance is destroyed at the threshold. It lacks statutory authorization, and this despite the fact that its reach is more ambitious than any before essayed even with enabling legislation.
By the unsupportable extrapolation from existing enabling acts, one may not usurp- the unique responsibility of the Legislature, even where it has failed to act. What is worse, to do this, as a State Legislature would not, without considering the social and economic ramifications for the locality, region, and *390 State, and without limitations essential to an intelligent delegation, is unsound as well as invalid. Moreover, to allow Ramapo’s idiosyncratic solution, which would then be available to any other community like Ramapo, may end indefinitely the possibility of commanding better legislation for land planning, just because such legislation requires some diminution in the local control now exercised under the zoning acts.
There are, to be sure, the constitutional issues in the case. Some relate to the power of government to deprive the landowner of any reasonable use of his land for a period of years, up to 18 years, without compensation. These are knotty problems confronting the draftsmen of a land development code. The problems are not insuperable. The initial, principal land zoning case, Euclid v. Ambler Co. (272 U. S. 365), held rather flatly, as far back as 1926, that an owner may he made to suffer a substantial loss in the economic potential of his land without compensation. But it has always been made clear that an owner could not be deprived of all reasonable use nor could his use be postponed for more than a short time, even if only to prevent an overloading of municipal facilities (Westwood Forest Estates v. Village of South Nyack, 23 N Y 2d 424, 428-429, supra; see, also, Arverne Bay Constr. Co. v. Thatcher, 278 N. Y. 222, 232; People ex rel. St. Albans-Springfield Corp. v. Connell, 257 N. Y. 73, 83). Be that as it may, for many reasons these constitutional issues are better reserved for future consideration. There is little doubt that the compulsion of current interests and conflicts will require a re-examination of much legal and judicial thinking in this area. The problem, however, is not only legal. As some students of the subject have pointed out, it is not enough to regulate land development. There must be incentive to develop, or else there will be little new housing except that which government could afford to build (Mandelker, The Zoning Dilemma, pp. 47-51). These are just some of the problems that the Ramapo ordinance glosses over as it attacks the problem for one town alone, a device that maybe a few more towns like Ramapo could adopt, but not all, without destroying the economy and channelling the demographic course of the State to suit their own insular interests.
At least one of the concurring opinions at the Appellate Division raised another constitutional question, namely, the power *391 of the town to adjust tax assessments as provided in the ordinance (see concurring opn. of Mr. Justice Hopkins, 37 A D 2d 236, 244-246). The point would be a salient one, if reached. It and the other constitutional questions need not and should not be reached because it is enough that the enabling acts do not permit the arrogation of power that the Eamapo ordinance projects.
Consequently, although the town had no power under the enabling act to adopt the ordinance in question, this does not mean that the town is not faced with a grave problem. It is. So are the many towns and villages in the State, and elsewhere in the country. But there is no doubt that the Eamapos, in isolation, cannot solve their problems alone, legally, under existing laws, or socially, politically, or economically. For the time being, the Eamapos must do what they can with district zoning and subdivision platting control. They may not declare moratoria on growth and development for as much as a generation. They may not separately or in concert impair the freedom of movement or residence of those outside their borders, even by ingenious schemes. Nor is it important whether their intention is to exclude, if that is the effect of their arrogated powers.
The exclusionary effect of local efforts to preserve the country’s Edens has been largely noted. Professor Eoberts, in an important essay, explores the conditions bedevilling places like Eamapo but also assesses the calamitous effects of ill-advised parochial devices (E. F. Eoberts, The Demise of Property Law, 57 Cornell L. Eev. 1). The problems of development of the larger community run so deep, he suggests that: “ ‘ Snob zoning, ’ of course, may best be [1] solved ’ by the legislature. This really is the lesson contained in Girsh which seems, moderately enough, to suggest that a regional planning mechanism should be devised to create a pluralist suburbia in which each class could find its proper place. More interest, however, is being generated by the notion of statewide land-use planning which presumably would allow each class its niche outside center city. Whether this interest in formulating state planning derives from a concern for the lower orders or reflects instead an irritation at the lack of order when a multitude of tiny hamlets makes any planning impossible, is difficult to tell.” (at p. 37). To leave vital decisions controlling the mix and timing *392 of development to the unfettered discretion of the local community invites disaster.
A glance at other legislation in this State reveals that regional or co-ordinated planning is not new to the Legislature, albeit the steps thus far taken may one day be regarded as quite primitive compared with what, necessarily, is to be. Article 12-B of the General Municipal Law contains a congeries of provisions authorizing optional metropolitan, regional, and county planning boards. Their powers are still rather limited. Perhaps most interesting is section 239-1 of that article which authorizes a scheme for mandatory co-ordination in counties or regions of various kinds of zoning action by the included municipalities. The legislation is significant evidence of the activity and understanding of the Legislature in land use planning, into which Bamapo would thrust itself beyond the limits now authorized by law.
A glance at history suggests that Bamapo’s plan to have public services installed in advance of development is unrealistic. Bichard Babcock, the distinguished practitioner in land development law, some years ago addressed himself to the natural desire of communities to stay development while they caught up with the inexorable thrust of population growth and movement. He observed eloquently that this country was built and is still being built by people who moved about, innovated, pioneered, and created industry and employment, and thereby provided both the need and the means for 4he public services and facilities that followed (Babcock, The Zoning Game, at pp. 149-150). Thus, the movement has not been in the other direction, first the provision of public and utility services and then the building of homes, farms, and businesses. This court has said as much, in effect, in Westwood Forest Estates v. Village of South Nyach (23 N Y 2d 424, supra) unanimously and in reliance on commonplace authority and precedent.
As said earlier, when the problem arose outside the State the judicial response has been the same, frustrating communities, intent on walling themselves from the mainstream of development, namely, that the effort was invalid under existing enabling acts or unconstitutional (National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, supra; Cirsh Appeal, 437 Pa. 237, supra; Bristow v. City of Woodhaven, 35 Mich. App. *393 205, supra; Lakeland Bluff v. County of Will, 114 Ill. App. 2d 267, supra; Concord Twp. Appeal, 439 Pa. 466, supra; Oakwood at Madison v. Township of Madison, 117 N. J. Super 11, supra). The response may not be charged to judicial conservatism or self-restraint. In short, it has not been illiberal. It has indeed reflected the larger understanding that American society is at a critical crossroads in the accommodation of urbanization and suburban living, with effects that are no longer confined, bad as they are, to ethnic exclusion or ‘1 snob ’ ’ zoning (see Roberts, op. cit., supra, at pp. 36-49). Ramapo would preserve its nature, delightful as that may be, but the supervening question is whether it alone may decide this or whether it must be decided by the larger community represented by the Legislature. Legally, politically, economically, and sociologically, the base for determination must be larger than that provided by the town fathers.
Accordingly, I dissent and vote to affirm the orders in both cases.
Chief Judge Fuld and Judges Burke, Bergan and Gibson concur with Judge Scileppi ; Judge Breitel dissents and votes to affirm in a separate opinion in which Judge Jasen concurs.
In each case: Order reversed, with costs, and the case remitted to Special Term for further proceedings in accordance with the opinion herein.

 The encompassing definition reads as follows:
“ Developer, Residential
“Any person (a) who, having an interest in land, causes it directly or indirectly to be used for residential development, or (b) who, directly or indirectly sells, leases or develops or offers to sell, lease or develop, or advertise for sale, lease or development any lot, plot, parcel, site, unit or interest for a residential development use, or (c) who engages directly or indirectly or through an agent in the business or occupation of selling, leasing, developing, or offering for sale, lease or development, a residential development use or any lot, plot, parcel, site, unit or interest for a residential development use, and (d) who is directly or indirectly controlled by, or under direct or indirect common control with any of the foregoing shall be deemed to be engaged in development use, residential.”